DAVIS (BLACHLY v.). See Case No. 1,456.

DAVIS (BROOKS v.). See Case No. 1,950.

DAVIS (BRYAN v.). See Case No. 2,065.

DAVIS (CANNON v.). See Case No. 2,385.

DAVIS (CARLETON v.). See Case No. 2,408.

DAVIS (CARLISLE v.). See Case No. 2,411.

## Case No. 3,628.

### DAVIS v. CHILD et al.

[2 Ware (Dav. 71) 78; [1] 3 N. Y. Leg. Obs. 147.]

District Court, D. Maine. Aug. 4, 1840.

MARITIME LIENS — REPAIRS, SUPPLIES, AND ADVANCES—DOMESTIC AND FOREIGN VESSELS—ADMIRALTY JURISDICTION — TRUSTS, ACCOUNTING, AND SPECIFIC PERFORMANCE.

1. By the general maritime law of Europe, material-men have a privileged lien on a vessel for repairs and supplies furnished for the vessel. But by the maritime laws of this country, they have no lien when the repairs are made and the supplies are furnished for a vessel in a port of the state to which she belongs, unless it is allowed by the local law.

[Cited in The Scotia, 35 Fed. 909.]

2. Where the repairs are made, or the supplies furnished, for a vessel in a port of a state to which she does not belong, she is considered a foreign vessel, and the rule of the general maritime law prevails.

[Cited in The Eliza Jane, Case No. 4,363.]

3. A person who lends money to be employed in the repairs of a vessel, or to furnish her with

[1] [Reported by Edward H. Daveis, Esq.]

supplies, has the same privilege against the vessel that material-men have. He is considered as giving credit both to the ship and to the owners. The ship is hypothecated to him for his security, and he may maintain, in the admiralty, either a libel in rem against the vessel, or a libel in personam against the owners. See [Thomas v. Osborn] 19 How. [60 U. S] 29, where this doctrine is affirmed. Whether this principle be supposed to have been borrowed from the Roman law, or to have had an independent origin in the commercial usages of the Middle Ages, it appears to be equally unquestionable in one case as in the other.

[Cited in Thomas v. Osborn, 19 How. (60 U. S.) 29; Collins v. The Fort Wayne, Case No. 3,012; The J. R. Hoyle, Id. 7,557; The A. R. Dunlap, Id. 513; The Custer, 10 Wall. (77 U. S.) 217; The Kate Tremaine, Case No. 7,622; The Tangier, Id. 13,744; The J. F. Spencer, Id. 7,316; Nippert v. The Williams, 39 Fed. 828, 829.]

4. The admiralty has a general jurisdiction to enforce all maritime liens.

[Cited in The Richard Busteed, Case No. 11,764.]

5. The admiralty has no direct jurisdiction over trusts, although they may relate to maritime affairs; if the libellant states a trust, as the foundation of his suit, he states himself out of court.

[Approved in Kellum v. Emerson, Case No. 7,669. Cited in Wenberg v. Cargo of Mineral Phosphate, 15 Fed. 288.]

6. Nor has the admiralty any jurisdiction over matters of account, merely as accounts, although they may arise exclusively out of maritime transactions. It can take cognizance of accounts, only as incidental to other matters over which it has jurisdiction.

[Cited in Tunno v. The Betsina, Case No. 14,236; The Brothers, 7 Fed. 878; Wenberg v. Cargo of Mineral Phosphate, 15 Fed. 288; The H. E. Willard, 53 Fed. 600, and 52 Fed. 388.]

7. Nor has the admiralty jurisdiction to enforce the specific performance of an agreement relating to maritime affairs.

[Cited in Deely v. The Ernest & Alice, Case No. 3,735; The C. C. Trowbridge, 14 Fed. 874; Paterson v. Dakin, 31 Fed. 684.]

The substance of this case, as stated in the libel, is as follows: On the 29th of March, 1837, Child & Dole, being the owners of the schooner Sultan, let her on shares to one Prince B. Lewis, to be employed in the coasting trade. He proceeded in the vessel to the southern states, and employed her until the 13th of October, 1838, when the owners, having become dissatisfied, employed Jacob B. Stanwood to proceed to New Orleans, to take possession of the vessel for them. He went accordingly, and took the schooner into his possession, and appointed James P. Coffin, master. On the return of the Sultan, from a voyage to Texas, in February, 1830, she was found to require repairs; and it was then also ascertained that there were large sums due for debts alleged to have been contracted on account of the vessel, by Lewis, the former master. Lewis had absconded and was not to be found. For the purpose of settling these accounts, and for raising money to pay the expenses of these repairs, Stanwood applied to the libellant [Samuel Davis] for a loan, who advanced the money for that pur-

7 FED. CAS.—8

pose. Afterwards, on the 22nd of March, the libellant, at the request of Stanwood, caused process to be sued out against the vessel for the money he had advanced; and it was agreed between them that, at the sale, she should be purchased by the libellant, provided that she sold for less than her value, for the benefit and in trust for the owners, Child & Dole. The object of the sale was to free her from the claims of other creditors. She was sold under an order of court, and bought by the libellant, May 24, 1830, he, by the agreement with Stanwood, taking the conveyance in his own name, and to hold the legal title of the vessel as a security for his advance, but in trust for the owners; and by the direction of Stanwood, acting as the agent of the owners, he caused the repairs to be completed and the vessel to be fitted for sea. Stanwood left New Orleans before the repairs were finished, having given directions to the libellant to procure for her a freight, when repaired, as soon as practicable, to take the entire management and control of the vessel, and act for the interest of the owners. The libellant expended upon the vessel, at New Orleans, $2,339.32. He then appointed Thomas F. Hinds, master; procured freight, and she sailed for Mobile, June 26, 1839. After going to sea she was found to leak, and on her arrival at Mobile it was found, from the defective condition of her bottom, that further repairs were necessary to render her seaworthy, and she was further repaired by the direction of the libellant, acting under the authority derived from Stanwood, at the cost of $3,272.89. She then sailed with a freight for Boston. When she had been out about four days, she was run into by another vessel, and was obliged to put into New Orleans for repairs, where she was again repaired under the direction of the libellant, at the expense of $1,418.75. She then sailed for Boston, where she arrived on the 27th of April, her freight amounting to $1,338.56, after deducting her expenses of $502.27, leaving a credit to the owners of $836.29. A bill of particulars, annexed to the libel, contains a statement of all the moneys expended by the libellant, on account of the vessel, and all he has received for insurance, average, and freight, leaving a balance now due him of $4,828.37. The libel concludes with a prayer that the court will pronounce for the repayment of the balance of the sums expended, and that Child & Dole may be required to accept a reconveyance of the vessel, which the libellant now tenders. To this libel, the respondents put in a plea to the jurisdiction. The question of jurisdiction was ably argued.

Mr. Fox, for libellant.

C. S. Davies, for respondent.

WARE, District Judge. Two questions arise upon the pleadings in this case, and which have been elaborately argued by the

counsel. The first is, whether a person who lends or advances money to be expended in repairing a vessel, or in furnishing her with supplies necessary for her employment, as provisions for the crew, can maintain a libel in personam against the owners for such advances, or a libel in rem against the vessel herself. The second is, admitting the first question to be decided in the affirmative, whether the jurisdiction of the court can be maintained on the particular facts alleged in this libel. The first question does not appear to me to involve any serious difficulty. It is true that no judicial decision was cited, at the argument, directly in point, and I am not aware of any reported case, in which the precise question has been presented for decision. But the jurisdiction of the court seems to me to stand on principles too well established to be brought into doubt.

By the general maritime law of Europe, any person who furnishes materials or labor for the repair or equipment of a ship, or supplies her with things necessary for her employment, as provisions for the crew, acquires by this alone, without any express stipulation for that purpose, a tacit hypothecation of the ship itself for his security. In this country, no such implied hypothecation is recognized by the common or customary law, when the repairs are made, or the supplies furnished, in a port of the state to which the vessel belongs. In some of the states, the local law gives a lien, and where it does, it may be enforced by the admiralty. Peroux v. Howard, 7 Pet. [32 U. S.] 12,324; Harper v. New Brig [Case No. 6,090]. But by the common maritime law of this country, if the supplies are furnished in the port of a state to which the vessel does not belong, the privilege is admitted, and the lien attaches. The Jerusalem [Id. 7,294]; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409; The Gen. Smith, 4 Wheat. [17 U. S.] 438; The Aurora, 1 Wheat. [14 U. S.] 105. The creditor, in such a case, is considered as giving credit both to the ship and the owners, and he may proceed in the admiralty against either. But it was contended, at the argument, that this privilege is confined to the persons who actually furnish the supplies or make the repairs, called, in the language of the admiralty, material-men, and is not extended to a party who loans money, which is expended in repairs or in furnishing materials for the vessel. The ground assumed in the argument is, that such advances are to be considered as a common loan, not distinguishable from any other credit arising in the common course of mercantile business, and that the purposes for which the money was advanced and to which it was applied, cannot be inquired into, to show that the consideration was maritime, and thus within the cognizance of the court as a cause of admiralty and maritime jurisdiction.

The first inquiry that is naturally suggested, as a test of the jurisdiction, is, whether such a loan is held by the maritime law to be a privileged debt, giving the creditor a lien on the vessel for his security. If it does, then I hold it to be clear, that it may be enforced by this court, for the admiralty has a general jurisdiction to enforce all maritime liens. The lien which material-men have against the ship, for repairs or supplies, has been supposed to be derived from the Roman law. Abb. Shipp. p. 102, c. 4, § 10. Now if this privilege of the creditor be admitted to be a principle borrowed by the maritime law from that of Rome, there would seem to be an end of the controversy as to the rights of the lender, for it is quite clear that in the Roman law he had this privilege. It was a general principle of the law of Rome, that any creditor who loaned money to be employed in preserving, repairing, or improving a thing, had a privilege against it for the reimbursement of the loan. Domat. Lois Civiles, Liv. 3, tit. 1, § 5, n. 6, 7. The very case, of repairing a vessel, is put as an illustration of the general doctrine. "Qui in navem extruendum vel instruendun credit vel etiam emendum privilegium habet." Dig. 42, 5, 26, 34; Id. 20, 4, 5. 6. And the privilege, in the Roman law, extended to a creditor who loaned money for the purchase of a ship. Indeed, by the text of the law, the privilege seems to be confined to the lender, and it is only by analogy that it is extended to comprehend the immediate furnisher of the materials or labor by which the vessel is repaired. Domat. Liv. 3, tit. 1, § 5, n. 9. And the principle was carried further in favor of lenders. If the master hired money of a third person, with which he paid the creditor who loaned directly for the repairs of a ship, this new creditor was subrogated to the right of the first lender, and considered as giving credit to the owner. Dig. 14, 1, 1, § 11. Domat. Liv. 3, tit. 1, § 6, n. 6. But by the Roman law, this was a mere personal privilege, and did not involve a tacit hypothecation of the thing. It gave to the creditor a right of preference, jus praelationis, a right of prior payment out of the thing, over the general creditors of the owner; but his right was postponed to all hypothecary creditors. Emerigon, Contrate a la Grosse, c. 12, § 1; Vinnius, Select. Jur. Quaest. 42, c. 4. And the privilege of the creditor was postponed to that of the fisc. Dig. 42, 2, 34. But these personal privileges of creditors, independent of hypothecation, are unknown to the maritime law. In that law, every privilege implies a tacit or privileged hypothecation. Emerigon, Contrate a la Grosse, c. 12, § 2, § 1. Cleirac, Jurisdiction de la Marine, art. 13, No. 6. Whether the rules of the maritime law on this subject were derived from the Roman law, or what is more probable, had their origin in the customs and usages of maritime commerce in the Middle Ages, there is no doubt, that a person who lends money for

the purpose of repairing a vessel, or of furnishing her with supplies, and which is actually employed for that purpose, is entitled to the same privilege against the ship, as one who actually furnishes the supplies, or performs the labor. The reasons of justice, equity, and public policy are the same in the one case as in the other, and the law makes no distinction between them. It makes no difference, says Emerigon, whether one has furnished the materials, or loaned the money with which they have been purchased. Contrate a la Grosse, c. 12, § 4. A merchant whose goods are sold in the course of the voyage, to supply the necessities of the ship, is entitled to the same privilege, this being, in fact, a loan to the vessel. We find this privilege of the lender for the repairs or the necessities of the vessel, established in the earliest monuments that remain of the maritime law of the Middle Ages. In the Ordonnance of Peter 4th of Aragon, of 1340, for regulating the proceedings of the consular or maritime courts, which makes the first forty-two chapters of the common editions of the Consulate of the Sea, it is said, that in the sale of a new vessel, before she had made a voyage, the laborers and furnishers of materials shall have the first rank of privilege, and be preferred to creditors who have loaned money for the building of a ship, but still recognizing the privilege of the lender·as subordinate to that of the workmen. After she has made a voyage, the mariners shall hold the first rank of privilege, and after them come those who have loaned money for the use of the vessel. 5 Pardessus Lois Maratimes, pp. 389, 325, c. 32, 34. Cleirac marshals the privileges in the same order—that of the mariners first, and after them, creditors who have lent money to repair or to purchase rigging and provisions for the ship; and he quotes this Ordonnance from the Consulate as authority. Jurisdiction par la Marine, art. 5, § 15, and Id. art. 18, §§ 4, 5. The rule established by the French Ordonnance of 1621, is, that upon the seizure and sale of a vessel, the wages of the mariners for the last voyage shall be first paid, in preference to all other creditors, and after them, those who have loaned money for the necessities of the ship during the voyage, and thirdly, those who have loaned money for repairs, for provisions, or the equipment of the ship, before the commencement of the voyage. Liv. 1, tit. 14, art. 16. That is, according to Valin, those who have loaned on bottomry or otherwise, for the repairs, victualing, or equipment of the vessel, and these comprehend carpenters, calkers, and other workmen who have been employed in the repairs, as well as those who have furnished the materials used in the repairs, and also the keepers of boarding-houses, who have, by order of the master, boarded the crew while repairs were being made (1 Valin, Comm. p. 363), putting the lender in the same class with the furnishers of materials and the workmen. Boulay Paty, in his commentary on the Code de Commerce, says, that the privilege exists, as well in favor of the simple lender, as of him who takes the security of a bottomry bond. 1 Cours de Droit Maratime, p. 119, tit. 1, § 2.

Indeed, it appears to me, that upon the principles of the maritime law, it is very clear, that a person who lends money to be expended in repairing a vessel, or in furnishing her with provisions, or fitting her for sea, has the same privilege against the vessel, which is allowed to material-men who are the actual furnishers, or the mechanics who perform the labor. The authorities are entirely conclusive. The lender is considered as trusting to the ship, as well as the owners; and by the loan itself, he acquires a privileged hypothecation, which is as sacred in every respect as that which is created by an instrument of bottomry, except that he is not entitled to maritime interest. Peckius, Ad Rem Nauticam, p. 99, and Vinnius' note; Kurike, Quaest. Illust., Quaest. 13; Voet, Ad Pand. 20, 19; Stypman, Jus Maritimum, par. 4, c. 5, § 146. By the law of this country, the privilege exists only where the credit is given to a vessel, in a port out of the state to which she belongs, unless it is allowed by the local law. Now, if the law allows to a creditor a lien on the vessel for his security, the jurisdiction of the admiralty follows of course. This is the appropriate court to enforce maritime liens, and the only court in which it can be done effectually. If the admiralty has jurisdiction over the matter in a proceeding in rem, I do not see on what principle the jurisdiction in personam can be denied. It is only on the ground that the contract is maritime, that the court can issue process against the thing. It is the subject-matter that determines whether it is of admiralty and maritime jurisdiction or not; and if it is so, the court has jurisdiction as well in personam as in rem. In this case, the consideration of the contract is purely maritime. If this were the only ground on which the plea could be supported, I should feel no difficulty in overruling it, and requiring the respondents to answer to the merits. Upon the principles stated, the jurisdiction would attach for the money advanced for repairs in the first instance, before the vessel was sold, and when legal title was in Child & Dole. But for these advances the vessel was arrested and sold. The libellant was the purchaser, and took the legal title in his own name. If the jurisdiction of the court rested on a lien alone, it is clear that the libel could not be maintained on this claim, for by the sale the lien was discharged. But as the admiralty has jurisdiction in favor of material-men in personam as well as in rem, if the proceeds of the sale were not sufficient fully to discharge the debt, the libellant's claim may be good against the owners for the balance, for a decree against the vessel, without satisfac-

tion, might not discharge the owners from their liability. It does not, however, appear from any allegation of the libel, but that the libellant was fully paid for all his advances, made before the sale of the vessel, by the proceeds of the sale; and from the bill of particulars annexed to the libel, it appears, that, in point of fact, he was. As the libellant, by the form of his pleading, has made this a part of his libel, my opinion is, that this part of his claim must be taken as satisfied.

The only question that remains is, whether the libel can be maintained on the transactions that took place after the sale. It is alleged in the libel, that the seizure was made and the vessel sold under a decree of court, on proceedings instituted by the direction of the agent of the owners; and that by an agreement between the libellant and the agent, he became the purchaser for the owners, and took the legal title in his own name, as a security for advances to be made, but for their use, and to be held for their benefit; and that all the subsequent expenditures upon and on account of the vessel, were made in pursuance of his orders, and for the benefit of the original owners. The libellant, therefore, states himself to be the trustee of the respondents. All the expenditures were for the vessel while he was the legal owner. If the plea is overruled and the respondents are required to answer to the merits, the first question presented for decision, if the fact is denied by the answer, will be, whether the libellant is trustee or not; whether he took the legal title for the benefit of the respondents, or purchased on his own account. Now, let it be admitted, that the subject-matter of the contract set up in the libel—that is, the repairs made and the supplies furnished—are within the undoubted jurisdiction of the admiralty, can the court take cognizance of the case, where, in order to arrive at the merits, it must first decide a question covering the whole case, which is of the peculiar, and generally the exclusive, jurisdiction of another tribunal, and is not within the jurisdiction of this court? In other words, can the court take jurisdiction of a trust ex directo, as constituting the very foundation of the suit? It seems to me that it cannot, and when the libel sets forth a trust, upon which the court must pronounce a judgment ·before it can look at the merits on which relief is sought, that the libellant states himself out of court. Matters of trust, whether in relation to real or ·personal property, belong to the peculiar and appropriate jurisdiction of courts of equity, and the modes of proceeding in equity are particularly adapted to the discovery and enforcing of trusts; and though it is true that courts of common law do take cognizance of some matter of trust, as in the case of bailments (1 Story, Eq. Jur. § 60), yet the general rule is, that mere matters of trust are within the exclusive jurisdiction of equity. (2 Story. Eq. Jur. § 960). It is admitted that the admiralty is competent to pronounce up-

on the question of title to vessels, but when this is said, I apprehend that generally the legal title is intended. It is not, however, intended to be denied, but that this court may take notice of an equitable title when it comes up incidentally, especially when it is alleged in the way of defense, in a case over which the admiralty has a clear and unquestionable jurisdiction. In a suit for possession, it might well decline to interfere in favor of the legal title against one who had an equitable title, at least until the rights of the parties had been settled by a competent tribunal. It is admitted also, that when the admiralty has jurisdiction of the principal matter, it has authority to pronounce on the incidental questions which may arise in the cause. The Tilton [Case No. 14,054]. But my difficulty is, that in this case the equitable title does not arise incidentally, but is alleged in the libel as the very foundation of the libellant's title to relief. Such a case, it appears to me, cannot be properly a subject of admiralty jurisdiction. Indeed, the libel seems to me to be a bill in equity in disguise.

But the case presents other objections to the jurisdiction, which, if not insuperable, are not easily overcome. The libellant alleges, that in pursuance of an agreement with the agent of the owners, he purchased the vessel for them, and took the title in his own name, to be held for their benefit; that he expended on the vessel, at different times, large sums of money, in repairs and in the purchase of supplies, having the control and management of the vessel, and receiving for their use her earnings; and the libel concludes with a prayer that the respondent may be required to receive from him the legal title and pay him the balance of his account. The suit, therefore, in one aspect, partakes of the nature of a bill in equity for a specific performance of an agreement. It was never contended, that a court of admiralty has the authority to decree a specific performance of an agreement. If the court, in this case, should pronounce for the payment of the balance of the account, it might perhaps, annex a condition that the libellant should reconvey the vessel to the respondent. But a direct suit for the specific performance of an agreement is a thing unheard of in the admiralty. But allowing this objection may be avoided, there is more difficulty in overcoming the other. The libel unavoidably involves the taking of an account, for it is indispensably necessary, in order to ascertain the balance. There might be here, in equity, matter for a cross bill, if the defendants chose to resort to it, in order to extract the facts directly from the party, though the admiralty might, perhaps, obtain the same object by an examination of the party on interrogatories. But the suit itself seems to be primarily for an account. Now the admiralty has no direct jurisdiction over matters of account, although they may relate purely to

maritime affairs. The New Orleans v. Phebus, 11 Pet. [36 U. S.] 175. The simplicity and directness of its course of proceeding are not .supposed to be adapted to such controversies, and a libel for an account directly will not lie in the admiralty. The court takes cognizance of accounts only when they arise incidentally in a cause, as in a suit on a bottomry bond or for average. Libel dismissed.