## THE POZNAN.

(Circuit Court of Appeals, Second Circuit. July 13, 1925.)

No. 243.

1. Shipping ⊕═133—Vessel is liable in rem for performance of contract to transport goods laden.

A vessel is liable in rem for performance of contract to transport goods laden therein.

2. Wharves ⊕═18—Wharfage charges constitute "maritime liens."

Wharfage charges for period when vessel is receiving and landing passengers, or loading or unloading freight, constitute "maritime liens."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Maritime Lien.]

3. Maritime liens ⊕═1—Cannot be extended by construction, analogy, or inference.

Maritime lien is stricti juris, and cannot be extended by construction, analogy, or inference.

4. Maritime liens ⊕═1—"Maritime lien" defined.

A "maritime lien" is a special property right in ship given to creditor by law as security for debt or claim subsisting from moment debt arises with right to have ship sold and debt paid out of proceeds.

5. Admiralty ⊕═10—Contract rights are maritime, when they relate to ship as instrument of commerce.

Contract rights are maritime, and so within admiralty jurisdiction when they relate to ship as instrument of commerce.

6. Wharves ⊕═18—Contract for wharfage of vessel withdrawn from navigation will not support maritime lien.

Contract for wharfage of vessel withdrawn from navigation is not maritime, and will not support maritime lien.

7. Wharves ⊕═18—No maritime lien arises for wharfage of vessel while in custodia legis.

No maritime lien arises for wharfage of vessel withdrawn from navigation while in custodia legis.

8. Liens ⊕═1—"Lien" is charge on thing.

A "lien" is not property in a thing itself, nor is it a right of action for the thing, but is rather a charge on the thing.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Lien.]

9. Admiralty ⊕═1, 16—Admiralty court not court of equity.

Admiralty court is not a court of equity, and is not entitled to adjudicate matters primarily of nonmaritime jurisdiction, and it will not enforce equitable liens.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the New York Dock Company against the Steamship Poznan, wherein the John B. Harris Company intervened. Decree for libelant, and intervener appeals. Reversed.

See, also, 297 F. 345.

This cause comes here on appeal from the United States District Court for the Southern District of New York. It is an appeal from a final decree entered in favor of the libelant on June 17, 1924, in the amount of $16,628.70, with interest.

The libel was filed against the steamship and her owners, and claimed a lien in the sum of $17,462.03. It asserted that the amount named was a reasonable and customary charge for certain services of wharfage and berthage given to the S. S. Poznan by the libelant in the city of New York on the request of the master of the vessel, to whom its management was intrusted. The libel alleged that the steamship remained at libelant's wharf or wharves from December 1, 1920, until March 12, 1921—being in all a period of 101¼ days. The New York Dock Company is hereafter referred to as the Dock Company.

The time to answer this libel expired without appearance having been made for the vessel, and a default decree was entered. Thereafter the intervener appellant, John B. Harris Company, a cargo owner who had libeled the Poznan (hereafter referred to as the intervener), applied for and obtained leave to intervene and defend.

During September, 1920, and prior to the wharfage services alleged in the libel, the steamship, a vessel of 8,405.72 gross, 5,298 net, and 11,250 dead weight, tons, registered

at the port of New York and owned by the Polish-American Navigation Corporation, but under charter to the Acme Operating Corporation, loaded at the port of New York a general cargo for transportation to Havana, Cuba. The cargo, however, was not delivered by the vessel at Havana, but was returned on the vessel to New York, where she arrived and docked at the pier of the dock company on December 2, 1920, or one day after the libel alleges the wharfage began. On the same day, and after the vessel had docked, she was arrested by, and taken into the possession of, the United States marshal for the Southern District of New York. Thereafter numerous libels were filed against the vessel for damage to cargo and for failure to deliver cargo in Havana; the majority of said libels being filed before that of the dock company. These actions of the various cargo owners were consolidated in one cause, entitled Joseph H. Davis against S. S. Poznan, Acme Operating Corporation (the charterer), and Polish-American Navigation Corporation (the owner), and thereafter an interlocutory decree was entered therein against all three, and a reference directed to a commissioner. Subsequently the vessel was sold by the marshal under this consolidated libel for the sum of $253,000 gross. As neither the owner nor the charterer proved to be financially responsible, in order to save expense, an agreement was entered into between all the consolidated libelants, terminating the hearings before the commissioner after sufficient claims to exhaust the fund had been proved, and agreeing that the recovery under the final decree on behalf of the libelants who had proved their claims should be paid to the trustees, and by them distributed in accordance with the orders of a committee of six proctors, selected by the libelants. The committee found the total sum due all libelants to be approximately $1,216,000, and up to the date of the reference in this action had ordered payment out of the fund of a dividend of 17 per cent. on each libelant's claim, leaving a balance of approximately $38,000, of which $20,000 was to be held to secure the dock company's claim.

On November 30, 1920, the dock company and the Polish-American Navigation Corporation entered into an agreement for the use of the dock company's pier by the ship; the Polish-American Navigation Corporation agreeing to pay therefor $250 per day to commence from 7 a. m. December 1, 1920, and to continue up to the time the steamer left and all cargo was removed, and in addition for lights for cleaning the pier and for carting dirt at agreed rates. This agreement was not made with the master of the ship, and was made previous to the arrival of the vessel in New York. The Polish-American Navigation Corporation made payments to the dock company under the contract. The payments totaled $9,500, and left a balance unpaid amounting to $16,962.03. The cargo was completely discharged from the vessel at 2 p. m. February 18, 1921, and the delivery of the cargo from the pier was completed March 1, 1921; the vessel remaining fast to the pier until March 11th. On December 9, 1921, no payment having been made by the Polish-American Navigation Corporation on account of the wharfage since February 22, 1921, an agreement was entered into by the navigation company and the dock company whereby the latter company agreed not to press its claim for the sale of the ship, providing the outstanding charges for wharfage were paid by the navigation corporation in certain installments as set forth in the agreement. The navigation corporation made the initial payment of $500 under this agreement on December 16, 1921, but no further payment was made thereafter, although prior thereto $9,000 had been paid by it.

On January 6, 1921, nearly a year previous to the agreement above referred to between the dock company and the navigation corporation and the payment of $500 thereunder, the dock company presented to the United States marshal a bill for the wharfage and charges then due, together with a letter stating that the bill represented charges against the ship to the date of the letter, and that charges would continue to accrue as long as the vessel remained there, and that, in case there was any question as to the marshal's liability, the dock company wished to be advised immediately. The following day the dock company wrote another letter to the marshal, explaining that the steamer's wharfage charge included in the bill covered, not merely the right to make fast to the pier, but also the use of the company's pier for discharging and storing cargo. On January 7, 1921, the dock company received from the marshal a reply, in which it was said: "The marshal does not and will not assume liability for any charges against this vessel, until so directed by order of the court."

After the decree was entered against the ship in the consolidated libel suit, the dock

company requested the United States marshal to include its claim for wharfage as part of the bill of costs submitted by the marshal, and this was done. Upon objection this item was struck out by the United States District Court clerk, whose action was confirmed by the court without prejudice to the right of the dock company to claim against the proceeds of the vessel, and an order to this effect was made on June 6, 1922.

The action came on for trial before the district judge, and on March 23, 1923, he handed down an opinion in which he found that no maritime lien for wharfage arose because the vessel was in the custody of the court; that nevertheless the appellee, which furnished the wharf, had an equitable claim on the fund (the price realized on the sale of the ship by the marshal), though not a maritime lien on the ship, and in priority to the lienors, to protect whose liens the service was rendered; that the measure of recovery was the fair value of the wharf between December 2, 1920, and the time when the ship could first have been moved, which fair value would not necessarily be the contract price of the pier; that the lights and other incidental services were to be included; that the $9,500 paid by the Polish-American Navigation Corporation should be applied for as many days' wharfage at $250 per day plus incidentals as it would cover; that, if the parties could not agree upon the amount, the issue would be referred to a commissioner.

On July 13, 1923, the district judge handed down a supplemental opinion, in which he said: "The lien here established was an equitable lien against the lienor's own rights in the vessel arising after she was in custody."

He further said that the measure of the dock company's lien is the benefit which the consolidated libelants received from the services rendered, which in his first opinion he assumed would be the reasonable value of wharfage.

The interlocutory decree provided that the dock company "has an equitable lien upon the proceeds from the sale of S. S. Poznan in the consolidated suit of Joseph H. Davis against the S. S. Poznan in this court, for the value of its wharfage services rendered to the said libelants in said cause in priority to the prior maritime liens against such proceeds of the said libelants in said consolidated suit," and the court appointed a special commissioner to take proofs and report. Thereafter hearings were held before the commissioner, and on May 1, 1924, he made his report, in which he found that the reasonable value of the benefit enjoyed by the consolidated libelants was $16,628.70.

Exceptions to the commissioner's report were duly filed by the intervener, and, after a hearing before the district judge, the report of the commissioner was confirmed, and the final decree was entered on June 17, 1923. It decreed that the dock company recover the amount as found by the commissioner, and that such amount is a prior lien upon the proceeds of the sale of the ship in the registry of the court, and is directed to be paid in full out of said proceeds in priority to any payment to the intervener herein or to the consolidated libelants. An appeal was duly taken from said final decree, and assignments of error were filed.

Hunt, Hill & Betts, of New York City (Geo. Whitefield Betts, Jr., Mark W. Maclay, and Edna F. Rapallo, all of New York City, of counsel), for appellant.

Davies, Auerbach & Cornell, of New York City (Charles E. Hotchkiss and Alexander J. Field, both of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The libel in this case was filed against the steamship Poznan by the dock company as the owner of a private wharf under a license issued by the city of New York. The libelant claimed that for wharfage services extended to the vessel there was due to it the sum of $17,462.03, with interest. It asserted that demand of payment had been made, but payment had been neglected or refused. It prayed that a decree for the amount named might be entered, and that the vessel might be condemned and sold to pay the demand.

It appears that, prior to the filing of the libel above mentioned, the ship had been libeled by Joseph H. Davis and various other libelants, including the John B. Harris Company. These libels were filed for breach of contract of affreightment. By order of the court they were consolidated into one suit, which is hereinafter referred to as the consolidated cause. In that cause a decree was entered in favor of the libelants, the vessel was sold, and the proceeds were paid into the registry of the court. They were insufficient to satisfy the decree.

In the meantime the dock company had

filed its libel (the instant case) which libeled the vessel for wharfage, and the John B. Harris Company intervened, excepted, and later answered to protect its lien obtained in the consolidated cause.

The court below decreed in the instant case that the libelant, the dock company, should recover the sum of $20,325.41. This amount included interest and costs. It ordered and decreed that this sum constituted a prior lien to that of the John B. Harris Company and the various other libelants in the consolidated cause who filed the earlier libel for breach of the contract of affreightment, and who obtained the decree under which the Poznan was sold, and which resulted in the deposit of the proceeds in the registry of the court. This decree was entered in the instant case on June 17, 1924.

At the time of this suit about $240,000 was left in the registry, being the proceeds of the sale. It is agreed that the libels in the consolidated cause claim damages aggregating about $1,700,000, and that the actual provable damage will exceed the amount left in the registry of the court.

The John B. Harris Company, in its own behalf and that of the other libelants in the consolidated cause which had been previously commenced against the Poznan, appealed from two decrees entered in the suit now before the court. These were:

(1) An interlocutory decree dated July 23, 1923, which decreed that the libelant (the dock company) had an equitable lien upon the proceeds in the registry for the value of its wharfage services, and that this equitable lien had priority to the prior maritime liens against such proceeds of the libelants in the consolidated suit.

(2) The final decree of June 17, 1924, which decreed that the total sum due to the libelant (the dock company), including interest and costs, amounted to $20,325.41. And it further decreed that the aforesaid amount constituted a prior lien upon the proceeds of the sale of the ship deposited in the registry of the court, and it directed that the said amount should be paid "and discharged in full out of said proceeds in priority and preference to any payment from said proceeds to John B. Harris Company, the intervener herein, or to the libelants in the said consolidated cause of Joseph H. Davis against the steamship Poznan, her engines, etc., et al., or to either of them; and it is further ordered, adjudged, and decreed that New York Dock Company, the libelant herein, recover of said John B. Harris Company, intervener, such part of the costs heretofore or hereafter taxed herein as shall not be satisfied from the proceeds of said vessel."

The District Judge, disposing of the libel brought by the dock company, held that, after the vessel was arrested, no maritime liens arose against her, and that, in so far as the bill depended upon a maritime lien, it failed. But he held that the dock company, which furnished the wharf, while it did not have a maritime lien on the ship, nevertheless had an equitable claim on the fund in the registry of the court, and that this amounted to an equitable lien against the lienors' (the John B. Harris Company and various other libelants) rights in the vessel arising after she was in custody. He held that it "was a lien on their liens justifiable in this court only because the court had custody of the vessel under the arrest. That was the holding in The St. Paul (C. C. A.) 271 F. 265. It was not necessary that the lienors should consent, though possibly a consent might here be spelled out. A lien may arise based upon equitable considerations when the circumstances are such that the owners have enjoyed a benefit which it would be unjust for them to retain at the expense of him who rendered the services." From that decision the John B. Harris Company, intervener on its own behalf and that of the other libelants in the consolidated cause, has appealed.

It is therefore necessary for this court to determine whether the dock company's claim against the Poznan for the use of the wharf gave rise to an equitable lien which is entitled to priority over the lien of the John B. Harris Company and the other libelants in the consolidated cause, whose liens arose out of a breach of contracts of affreightment.

[1] No question is raised on this appeal as to the right of shippers to a lien on the ship for the performance of a contract of affreightment. It is a thoroughly established principle of the general maritime law that the vessel is liable in rem for the performance of its agreement for the transportation of goods; the goods having been laden on board. The Bark Edwin, 24 How. 386, 16 L. Ed. 599; The Freeman, 18 How. 182, 15 L. Ed. 341; The Yankee Blade, 19 How. 82, 15 L. Ed. 554; The Hermitage, Fed. Cas. No. 6,410, 4 Blatchf. 474; The Bark Winslow, Fed. Cas. No. 11,736, 4 Biss. 13; The Flash, 1 Abb. Adm. 67, 9 Fed. Cas. 252, Case No. 4,857; Scott v. The Ira Chaffee (D. C.) 2 F. 401. In the Freeman Case, supra, Mr. Justice Curtis said: "Under the maritime law of the United States the vessel

is bound to the cargo, and the cargo to the vessel, for the performance of a contract of affreightment." The right of a lien in such cases is recognized in Osaka Shosen Kaisha v. Pacific Export Lumber Co., 260 U. S. 490, 499, 43 S. Ct. 172, 174 (67 L. Ed. 364), where the court said: "The contract of affreightment itself creates no lien, and this court has consistently declared that the obligation between ship and cargo is mutual and reciprocal and does not attach until the cargo is on board or in the master's custody. We think the lien created by the law must be mutual and reciprocal; the lien of the cargo owner upon the ship is limited by the corresponding and reciprocal rights of the shipowner upon the cargo."

And in The Esrom, 272 F. 266, 270, decided in this court, it was said: "But the lien of the vessel upon the goods and of the goods upon the vessel attaches from the moment the goods are laden on board." That an action in rem lies against a vessel for breach of a contract of affreightment is not controverted in this case, and is not before this court.

The question which is here relates to wharfage. And it is not disputed in this case that wharfage accrues when a vessel makes use of a wharf for the purpose of receiving or discharging cargo or passengers, or as a place for mooring.

[2] Wharves and piers are properly regarded as a necessity of navigation, and as indispensable for ships that they may lie in port in safety, receive and land their passengers, as well as load and unload their freight. They are necessary for the safety and convenience of commerce and navigation, and are as essential to commerce as are the ships that navigate the adjacent waters. And it has long been settled that wharfage charges constitute maritime liens. In Ex parte Easton, 95 U. S. 68, 77 (24 L. Ed. 373), the court said: "Viewed in the light of these considerations, it is clear that a contract for the use of a wharf by the master or owner of a ship or vessel is a maritime contract, and, as such, that it is cognizable in the admiralty; that such a contract, being one made exclusively for the benefit of the ship or vessel, a maritime lien in the case supposed arises in favor of the proprietor of the wharf against the vessel for payment of reasonable and customary charges in that behalf for the use of the wharf, and that the same may be enforced by a proceeding in rem against the vessel; or by a suit in personam against the owner."

And in The Shrewsbury (D. C.) 69 F. 1017, 1020, District Judge Ricks states that "a lien for wharfage is made, under the general maritime law, a lien next in rank to wages." It is certainly a highly favored lien, but with its exact rank in the order of priority we are not now concerned.

[3] A maritime lien, it has been often said, is a secret one which may operate to the prejudice of general creditors and purchasers without notice. It is therefore regarded stricti juris, and cannot be extended by construction, analogy, or inference. Osaka Shosen Kaisha v. Pacific Export Lumber Co., supra; The Yankee Blade, 19 How. 82, 91, 15 L. Ed. 554.

[4] It is a right of property and not a mere matter of procedure. The Lottawanna, 21 Wall. 558, 579, 22 L. Ed. 654. Lord Tenterden defined a maritime lien as a privileged claim upon a thing in respect of service done to it or injury caused by it, to be carried into effect by legal process. Harmer v. Bell, 7 Moore P. C. 267, 284. It is an appropriation of the ship as a security for a debt or claim. It is given by the law, and it gives the creditor a special property in the ship, which subsists from the moment the debt arises, and it gives him a right to have the ship sold that his debt may be paid out of the proceeds of the sale. It is a right in the vessel, a jus in re. Benedict's Admiralty Law (4th Ed.) § 131.

[5, 6] Rights arising out of contract are maritime, and so within the admiralty jurisdiction when they relate to a ship as an instrument of commerce, intended to be used as such or to facilitate its use as such. And a contract, express or implied, for wharfage furnished to a vessel is a maritime contract. And in 40 Cyc. 910, it is said that, where wharfage is furnished, "a lien arises therefor enforceable in admiralty, when the wharfage is furnished in the ordinary course of navigation. But no such lien arises where the vessel has been withdrawn from navigation and is kept at the wharf for the mere purpose of storage." So in 30 Am. & Eng. Encyc. of Law it is stated that, where a vessel has been "withdrawn from commerce and navigation, and is laid up at a wharf for storage, such wharfage does not constitute a maritime contract of which admiralty has jurisdiction."

But wharfage charges do not, under all circumstances, constitute a maritime lien. A maritime lien arises out of a maritime contract or out of a maritime tort. In order that a maritime lien may arise out of contract, the service must in some way be brought into relation with the ship itself,

and tend to facilitate her use as an instrument of commerce.

In Hughes on Admiralty (2d Ed.) 22, it is said: "The same transaction may be maritime in one case and not maritime in another. As emphasizing this distinction, there is the maxim that 'a ship is made to plough the seas, and not to lie at the walls.' Hence wharfage rendered to a ship while loading or unloading, or in her regular use as a freight-earning enterprise, is a maritime contract. On the other hand, wharfage to a ship laid up for the winter while waiting for the season to open is not maritime."

The same distinction is illustrated by the cases which hold that watchmen on a vessel while in port during voyages are regarded as serving under a maritime contract, but those who have charge of her while laid up have no such contract. Erinagh (D. C.) 7 F. 231; Fortuna (D. C.) 206 F. 573; Hughes on Admiralty (2d Ed.) 22. And if a vessel is laid up for the season, or for any reason is withdrawn from navigation a contract for wharfage is regarded as a nonmaritime one. Benedict's Admiralty (5th Ed.) vol. 1, § 66.

[7] If the vessel is in custodia legis, she is for the time being withdrawn from navigation, and no maritime lien arises for wharfage charges incurred during the period she is so withdrawn. Such a lien arises only when the wharfage is furnished in the ordinary course of navigation. In The C. Vanderbilt (D. C.) 86 F. 785, District Judge E. B. Thomas of the Eastern District of New York held that the principle that a maritime lien exists for wharfage is not applicable to wharfage furnished to vessels "while withdrawn from navigation." He said: "A service furnished under such conditions is not within the fundamental reasons that have prompted the courts to award liens for wharfage, or for any other purpose. * * * But if an empty ship be tied to a wharf, because her field of operation is closed by ice, or because she is taken away from navigation, the case is widely different. She is at the wharf for no purpose of navigation, but for the precise purpose of nonnavigation, and because navigation is not contemplated. She is not at the dock for passengers, for freight, for repairs, or any purpose preceding or succeeding the actual voyage. She is not there for rest, even in the sense of lying up for some preparation for another voyage, or reparation from a voyage ended; but the sole reason of her presence at the wharf is that she has gone out of commission, withdrawn temporarily from navigation, abandoned for the time the purpose of her construction, because the locality of her journeying positively prohibits the continuance of such occupation, or because there is no occasion or opportunity for her use. The mariners are discharged, the boat is shut up, like a closed house, and is left in idleness to a caretaker or watchman, and so remains until the owner sees fit to withdraw her from this state of suspension for her appropriate use. Such an abandonment, such a complete isolation and disconnection with navigation, as this, bears no analogy to any condition of a ship when a lien is allowed for a service rendered her. Would a watchman or caretaker be entitled to a lien for his services on a boat in such a situation? How would such watchman's services be equivalent to the services of a mariner? The services of a mariner could not be required in the nature of the case, for the mariner is an operative, and the boat in winter quarters is a dead thing, to whom a mariner would be useless. It is difficult to conceive of any act of man in connection with a ship, or any condition of a ship, unless it be one of permanent abandonment, so divorced from navigation as this laying up of a boat at the end of a season, and at the close of navigation, until it should be wanted again, or the taking of a boat out of commission at any time for the mere purpose of storage. * * * But it will be found, upon investigation, that the principle of commercial activity on the part of a ship is always present when a lien is recognized for a service rendered her. Truly, she may be lying in apparent idleness at the dock; but she is indolent only in the sense that, in the matter of cargo or repairs or victualing or manning, she is making ready for her journey."

In The Esteban de Antunano (C. C.) 31 F. 920, a Mexican vessel at New Orleans was seized by the sheriff of the parish of Orleans under a writ of sequestration obtained in a state court on behalf of London bankers claiming the amount due under a mortgage. The court declared that, when a vessel passed into the custody of the law, it thereby terminated the authority of her owners and of their agents, the master and ship's husband, to affect the ship by any conduct or contract so as to give a lien on the ship.

In The Augustine Kobbe (D. C.) 37 F. 696, it was held that a mate, who had served on a ship on a voyage from Mobile to South America and return, and which on its return was seized under process at Mobile, and who remained on the vessel after her seizure, assisting the marshal in looking after the vessel, had no maritime lien which he could enforce against the proceeds of the vessel for

the period he served on the ship after her seizure. The court disposed of the claim by saying: "Of whatever merit the claim might be as a part of the marshal's expenses, if recognized by him, it certainly is not a maritime claim to be enforced against the proceeds of the vessel."

In The Mary K. Campbell (C. C.) 31 F. 840, 24 Blatchf. 475, Judge Wallace held that a wharfinger acquired no privileged lien against a vessel seized by a sheriff under an attachment, and taken to and kept at the wharf at the instance of that officer. In The Pulaski (D. C.) 33 F. 383, 384, it was held that to be the subject of an admiralty lien "the vessel must be, at the time, engaged in commerce and navigation, or in preparation therefor."

In The Andrew J. Smith (D. C.) 263 F. 1004, it was said: "If the wharfage charge is not a part of the repair bill, then no maritime lien arises unless the services have been rendered to a boat maritime in character at the time."

In The Philomena (D. C.) 200 F. 873, it was held that an engineer remaining on a vessel after it was taken out of the owner's control and while it was in custodia legis had no lien for wages during that time. His right to a lien was recognized up to the time of the seizure.

In The Nisseqogue (D. C.) 280 F. 174, 185, the district judge said: "After the marshal had taken the schooner into his custody on the 21st day of February, 1921, he was alone responsible for taking care of her. The master could not, by any contract or otherwise, confer upon the seaman a right to remain on the vessel and impose upon her a maritime lien for wages not earned at the date upon which she passed into the custody of the marshal."

In The Astoria, 281 F. 618, 621, the Circuit Court of Appeals of the Fifth Circuit said: "Upon the merits, we are of opinion that there was no maritime lien in favor of the crew for wages after the vessel was placed in the custody of the law, except for the extra month's wages authorized by statute. * * *"

In Beard v. Marine Lighterage Corporation (D. C.) 296 F. 146, 147, it is stated that for wharfage services "a maritime lien attaches to the ship in a home port if she is not out of commission or withdrawn from navigation."

A maritime lien arose out of the necessities of commerce. The maritime law recognized the principle that in contracts with a ship the ship herself is bound to the performance thereof; the other contracting party being given a lien on the ship herself for breach of the contract. A ship visits places where her owners are not known. The master is not usually of sufficient pecuniary ability to respond to the demands of the voyage, and he is the authorized agent of the owners. As Chief Justice Marshall said in The United States v. The Schooner Little Charles, Fed. Cas. No. 15,612, 1 Brock, 347, 354, "The vessel acts and speaks by the master."

In this case the wharfage contract was not made with the master of the vessel, but with the owner, the Polish-American Navigation Company, and the exact amount to be paid and the times of payment were expressly stipulated. The contract was not only made with the owner, but it included something more than wharfage services. It embraced a charge for lights at the rate of $1 per light, per night, for cleaning the pier, plus 10 per cent. and for carting dirt $2.50 per one horse load, and $1.30 for dump ticket when required, and $5 per two horse load, and $2.15 for dump ticket when required. All of this was additional to the $250 per day which the parties agreed should be charged for the use of the wharf. The bills were not made out against the ship but against the Polish-American Navigation Company, the owner, and also bills were sent to the United States marshal. Two months after that official had notified the dock company that he would not assume liability for any charges until he was directed to do so by order of the court, and, the Polish-American Navigation Company having been slow in making payments, and practically insolvent, the dock company filed its libel against the ship. But it at no time filed the notice claiming a lien against the vessel in the manner provided by sections 80 and 82 of the Lien Law of the state of New York (Consol. Laws, c. 33). The facts in many respects are similar to those in The Advance (D. C.) 60 F. 766, 768. In that case Judge Addison Brown felt constrained to find that no lien existed, among other reasons "the evidence indicates beyond doubt, as it seems to me, that the dealings were upon a personal contract between the two companies, which did not look to any credit of the ship, but only to the personal responsibility of the steamship company." On appeal to this court the decision below was affirmed in The Advance, 71 F. 987, 18 C. C. A. 404.

A maritime lien arose only where credit was given to the vessel, not where it was given to the owner or charterers. If the agreement was made with the owner, unless there

was an express agreement for a lien or the circumstances indicated that the services were rendered or the supplies furnished with the understanding that the ship itself would be responsible, no lien arose. The Valencia, 165 U. S. 264, 17 S. Ct. 323, 41 L. Ed. 710. See The Andrew J. Smith (D. C.) 263 F. 1004; The Hatteras, 255 F. 518, 520, 166 C. C. A. 586; The J. Doherty (D. C.) 207 F. 997; The Muskegon (C. C. A.) 275 F. 348, 350; The Suelco (D. C.) 286 F. 286. In this case the credit was not given to the ship, and the contract was not made with the master of the ship but by the ship's owner.

In The St. Jago de Cuba, 9 Wheat. 409, 417 [6 L. Ed. 122], the Supreme Court, 100 years ago said: "The whole object of giving admiralty process and priority of payment to privileged creditors, is to furnish wings and legs to the forfeited hull, to get back, for the benefit of all concerned; that is, to complete her voyage. * * * It is not in the power of any one but the ship master, not the owner himself, to give these implied liens on the vessel. * * * The vessel must get on; this is the consideration that controls every other; and not only the vessel, but even the cargo, is sub modo subjected to this necessity. * * * The necessities of commerce require that, when remote from his owner, he [the master] should be able to subject his owner's property to that liability [lien], without which, it is reasonable to suppose, he will not be able to pursue his owner's interests. But when the owner is present, the reason ceases, and the contract is inferred to be with the owner himself, on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived."

And in The C. W. Moore (D. C.) 107 F. 957, 958, District Judge Seaman, after stating the rule that a maritime lien arises out of a maritime claim contracted on the credit of the vessel, and not on the credit of the owner, and that credit to the vessel is implied when the obligation is incurred by the master, goes on to say that, if the contract is made by the owner, it "is presumptively made on the personal credit of the contracting party, and, without proof of facts or circumstances to repel the presumption, no lien attaches."

The Act of Congress approved June 23, 1910, c. 373, 36 Stat. part I, p. 604, § 1 (Comp. St. § 7783), provided that any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, upon the order of the owner shall have a lien on the vessel which may be enforced by a proceeding in rem, and it shall

not be necessary to allege or prove that credit was given to the vessel. And the act approved on June 5, 1920, c. 249, 41 Stat. part I, § 30, subsec. (p), p. 1005, repeated the words quoted from the provision in the act of 1910. The only change made was to add in the act of 1920 the word "towage" after the word "supplies." These acts have undoubtedly enlarged the right to a maritime lien. The United States v. Carver, 260 U. S. 482, 488, 43 S. Ct. 181, 67 L. Ed. 361.

The Supreme Court has pointed out that one of the objects of the act of 1910 was to do away with the doctrine that, when the owner of a vessel contracts in person for "necessaries," or is present in the port when they are ordered, it is presumed that the materialman did not intend to rely upon the credit of the vessel, and no lien arises. Piedmont Coal Co. v. Seaboard Fisheries Co., 254 U. S. 1, 11, 41 S. Ct. 1, 65 L. Ed. 97. If that was intended by the act of 1910, it was equally the intention of the act of 1920. But what is included in the word "necessaries"? That question has not yet been ultimately determined.

The question of what is meant, in the act of 1910, by the words "other necessaries" is discussed in 24 Harvard Law Review, 182, 196, 197, and the opinion was expressed that "wharfage would clearly appear to be brought within the scope of the act by the specific enumeration among 'other necessaries' of the use of a dry dock." That conclusion is strengthened by the use of the word "towage" in the act of 1920. And see United States v. Certain Subfreights Due Steamship Neponset (D. C.) 300 F. 981, 986, 987; The Liberator (D. C.) 298 F. 159; The Henry S. Grove (D. C.) 285 F. 60. But whether wharfage is a "necessary" within the meaning of the act of 1920 has not been decided by the Supreme Court or by this court.

This court, in The Muskegon, 275 F. 348, construing the words "or other necessaries" as used in the act of 1910, did not include the services of a master stevedore in loading a vessel in her home port. In The Hatteras, 255 F. 518, 166 C. C. A. 586, this court, passing upon the act of 1910, and the meaning of the same words, held that towage was not included within their meaning. In that case this court adopted the views of District Judge Veeder in The J. Doherty (D. C.) 207 F. 997, as to the meaning of the phrase "other necessaries" in the act of 1910, in which he held that they were not applicable to towage.

The question whether wharfage is a "necessary" within the meaning of the act of

1920 was not argued when this case was heard. As it is not important in the view which we take of the case, we express no opinion concerning it at this time. It is enough for the present purpose that no lien attached while the ship was in custodia legis, which was practically the entire period for which the bill was rendered.

But, if no maritime lien existed for the wharfage services afforded to the vessel while it was withdrawn from navigation and was in the custody of the United States marshal, as we have held is the case, is the libelant nevertheless entitled to an equitable lien, and, if so, one which is entitled to priority over the liens of the libelants in the consolidated suit? We confess that at first blush the suggestion strikes us with surprise that, while the wharf owner has no maritime lien during the period the ship was in custodia legis, he nevertheless has an equitable lien, and that such lien is entitled to priority over the maritime lien of the shippers.

The learned judge who decided this case in the court below relied upon the decision of this court in The St. Paul, 271 F. 265. And counsel at the argument in this court told us that that case is on all fours with the case at bar, and fully sustains the decree below. We do not at all agree with any such conclusion. There is nothing in The St. Paul Case which lends support to the doctrine now contended for. The question which the District Judge decided in the present case, instead of being as he assumed, the question which was decided in The St. Paul, is precisely the one which was not presented, or litigated, or decided in that case. The wharfage in that case was incurred pursuant to an order made by the court, and with the consent of all the libelants. It was made in the only way in which a maritime lien can be validly created against property in custodia legis; namely, by an order of the court. The assignment of errors in The St. Paul contained no reference to the subject of a lien either maritime or equitable; and an examination of the briefs submitted shows that no question of any kind of lien was in any way discussed therein. There were but two questions before this court in that case: One was whether this court could entertain the appeal; the other was the amount of wharfage to be paid, and for what period. There is nothing whatever in the opinion as to an equitable lien. The only reference to a lien contained in the opinion is in the following paragraph, which explains why this court thought it had a right to hear the appeal: "The method here pursued is without prece-

dent, and not to be approved as such; but we feel justified in treating the claim as it was below, viz., as a demand for preferential payment, or as an asserted superior lien on the proceeds of the steamship. Consequently a final order refusing (in part) such payment out of, or lien upon, a fund in the registry is the subject of appeal. Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157."

[8] Strictly speaking, a lien is not either a jus in re or a jus ad rem. It is not a property in the thing itself, nor does it constitute a right of action for the thing. It rather constitutes a charge upon the thing. Story, in his work on Equity Jurisprudence, vol. 2, § 1215, speaks of equitable liens "by which we are to understand, such liens as exist in equity, and of which courts of equity alone take cognizance." And Bouvier's Law Dictionary, defining equitable liens, states that they "are such as exist in equity, and of which courts of equity alone take cognizance." And Pomeroy, in his work on Equity Jurisprudence, vol. 3, § 1334, speaks of the doctrine of equitable liens as of wide application in administering the rights and remedies "peculiar to equity jurisprudence."

[9] Courts of admiralty, it is sometimes said, are courts of equity. This is because the principles of equity rather than the strict rules of the common law are those upon which the courts of admiralty act. But it is perfectly clear that a court of admiralty is not a court of equity, and that it is not entitled to draw within its jurisdiction matters primarily of nonmaritime jurisdiction. United Transportation & Lighterage Co. v. New York & Baltimore Transportation Line (D. C.) 180 F. 902; The Albert Schultz (D. C.) 12 F. 156; The Willamette Valley (D. C.) 76 F. 838, 844; Davis v. Child, 2 Ware, 78, 7 Fed. Cas. 112, Case No. 3,628.

In the separate and concurring opinion of the present writer in The Ada, 250 F. 194, 198, 162 C. C. A. 330, 334, it was said: "I also agree that courts of admiralty, having obtained jurisdiction, do not dispose of nonmaritime subjects, after the manner of courts of equity, for the purpose of doing complete justice. While admiralty courts act as courts of equity so far as their powers go, their powers are limited to maritime contracts or transactions, and they have no general jurisdiction to administer relief as courts of equity, or to administer complete relief. They differ, too, from the equity courts, in that they do not undertake to determine equitable rights."

In Kellum v. Emerson, 2 Curt. 79, 14 Fed. Cas. 263, Case No. 7,669, Mr. Justice

Curtis, sitting in the Circuit Court for the District of Massachusetts, held that the admiralty was without jurisdiction over a libel asserting an equitable title to one-fourth of a vessel, and claiming an account of its earnings, and the proceeds of its sale. The part owners sailed the vessel, and the libelant worked as a carpenter on board. In his opinion Mr. Justice Curtis said: "It is often said that a court of admiralty is a court of equity, acting on maritime affairs. This is true when properly understood. A court of admiralty applies the principles of equity to the subjects within its jurisdiction. But that jurisdiction differs very widely from the jurisdiction of courts of chancery; and in my opinion embraces no case, where an equitable title, arising out of a trust, is the basis of the claim, and its subject-matter is the proceeds of a sale wrongfully made, in violation of that trust. I have looked in vain for any precedent or any principle upon which to place such a jurisdiction. I am not aware that in any court of admiralty in England, or in this country, any serious attempt has been made to assert it, or obtain its exercise."

In The Amelia, 23 F. 406, an attempt was made in the Circuit Court for the Southern District of New York to attempt to enforce an equitable interest as against a legal title. But the Circuit Judge declared: "This the court of admiralty does not undertake. When it proceeds in a petitory suit, it proceeds upon legal title." The court affirmed the decree below.

In Benedict's Admiralty (4th Ed.) § 261, it is said: "In the exercise of its appropriate jurisdiction, the court of admiralty exercises equitable, as well as legal jurisdiction. If the subject be of a maritime nature, and so within the power of the court, and be of such a nature that the relief must be in the nature of equitable relief, the court is entirely competent to give the equitable, as well as the legal, relief. It has the capacity of a court of law, and in certain respects, the capacity of a court of equity. * * * It cannot, in a technical sense, be called a court of equity. It is rather a court of justice."

And this court in The Ada, 250 F. 194, 162 C. C. A. 330, speaking through Judge Ward, said: "Evidently the whole controversy could have been disposed of in an action at law, but the jurisdiction of a court of admiralty is confined to maritime subjects. It cannot, having obtained jurisdiction, dispose of nonmaritime subjects, for the purpose of doing complete justice, after the manner of courts of equity, nor can it distribute funds in its possession, as do courts of equity and bankruptcy, among all creditors, preferred and general. Its power to dispose of the proceeds of a vessel, though it extends to the payment of nonmaritime liens, after maritime liens have been satisfied, does not extend to claims in personam or of general creditors, except so far as to pay over any surplus to the owner."

In The Eurana, 1 F. (2d) 684, the Circuit Court of Appeals for the Third Circuit has recently decided that, in the absence of an express agreement therefor, or facts from which it would be implied, a general agent does not have a maritime lien for advances and disbursements made in behalf of vessels of his principal during his agency. It was pointed out that a maritime lien has its origin in a desire to protect the ship, and that such a lien, being secret and unrecorded, is stricti juris, and cannot be extended by judicial construction, analogy or inference. "Such liens," said the court, "are an exception to the rule that all creditors have equal rights in the property of their debtor. They rest upon an entirely different principle." In that case the Fleet Corporation claimed that the funds and fuel oil belonging to it had been used for the benefit of the vessel and/or her owners, and on that account claimed a lien on the vessel or her proceeds. But their claim was denied.

It is no doubt true that a party may by express agreement create a claim on property of which he is the owner or in possession and that in a proper case a court of equity will establish and enforce it. Pomeroy, in his work on Equity Jurisprudence, vol. 3, par. 1235, states the doctrine as follows: "The doctrine may be stated in its most general form that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees and purchasers or encumbrancers with notice. * * * The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, equity regards as done that which ought to be done."

The above doctrine was quoted approvingly, and applied, in Walker v. Brown, 165 U. S. 654, 664, 17 S. Ct. 453, 41 L. Ed. 865.

But in the instant case it does not appear from the agreement made between the dock company, as owner of the wharf, and the Polish-American Navigation Company, as the owner of the ship, that any intention existed to make the ship a security for the wharfage and other expenses which were incurred.

In Bispham's Equity (8th Ed.) § 351, it is said: "In modern times the doctrine of equitable liens has been liberally extended for the purpose of facilitating mercantile transactions, and in order that the intention of parties to create specific charges may be justly and effectually carried out."

But we find nothing in the facts of this case which indicates that any intention existed to make the ship a security for the charges incurred, or which took the case out of the rule that, where the ship is in custodia legis, no lien arises for wharfage services. And if, under those circumstances, no maritime lien arises in admiralty, we certainly have no reason for thinking that it arises in equity and that the courts of equity will accord it priority over the maritime liens created by maritime law, to say nothing of its recognition by the courts of admiralty. No decision asserting any such doctrine is known to us. We think it unsupported by authority and contrary to principle. The effect of creating an equitable lien and giving it priority over the maritime lien is, in plain language, an attempt to extend the maritime lien by construction by not calling it a maritime but an equitable lien. The courts have said many times that a maritime lien is stricti juris, and not to be extended by construction, analogy, or inference. What was decided in the court below seems to us to have been wholly unwarranted.

Decree reversed.