UNITED STATES v. BETHLEHEM STEEL CO., MARYLAND SHIPBUILDING & DRYDOCK CO. (No. 5199)[*][1]

*C.A.D. 891.
[1] Petition for rehearing denied October 6, 1966.

United States Court of Customs and Patent Appeals, August 4, 1966

*John W. Douglas*, Assistant Attorney General, *Alan S. Rosenthal*, *Martin Jacobs* for the United States.
*Sharretts, Paley & Carter* (*Joseph F. Donohue*, of counsel) for appellees.

[Oral argument April 7, 1966 by Mr. Jacobs and Mr. Donohue]

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Associate Judges

SMITH, Judge, delivered the opinion of the court:

This is an appeal by the United States from the judgment of the United States Customs Court, Second Division, sustaining protests concerning two "midbodies" for freighters. The issue is whether these midbodies are subject to the terms of the Tariff Act of 1930, as amended, or whether, because of substantive principles of law, the terms of the Tariff Act are inapplicable.

We shall first consider the nature of the midbodies. Appellees introduced the testimony of three witnesses and various exhibits. The court below summed up the evidence as follows:

It appears from the evidence that the midbodies in controversy were constructed in European shipyards in accordance with conventional designs, plans, and specifications prepared by naval architects which conformed to the accepted standards in the construction of watercraft generally and approved by governing bodies, such as the American Bureau of Shipping, the United States Coast Guard, and the United States Public Health Service.

The midbodies were over 500 feet in length and had a cargo capacity of between 12,000 and 14,000 tons. In order to facilitate their transatlantic voyage, they were equipped with a temporary bow and additional stiffeners were used to strengthen the stern. Furthermore, each craft had sleeping accommodations for a crew of eight men, each of whom had signed ships' papers for the crossing. They were equipped with light, heat, power, food, radio facilities, and navigational lights and signals in order to comply with navigational rules of the road and to indicate that the craft were under tow, as required by law for vessels only. (33 U.S.C., sections 144(c)(i), 145(b), and 145c(a).)

Upon their arrival in this country, the midbodies were suitable for use as vessels of the barge type for commercial use in the transportation of cargo. They were designed for ultimate use as cargo sections of self-propelled ore carriers on the Great Lakes.

The evidence also discloses that each craft carried marine insurance (plaintiffs' exhibit 7) which was secured for protection against damage or loss of the craft in transit and which also served as coverage for the crew of eight who manned the craft while crossing the ocean. In addition to the foregoing, the midbodies were equipped with liferafts, life preservers, anchor and chain, and a generator for light, heat, and messing.

Appellees' brief supplies further factual background:[2]

The evidence related to the midbody owned by Maryland Shipbuilding & Drydock Company[1] established that its design and specifications were prepared by a naval designer and that it was constructed by Verolme United Shipyards of Rotterdam, Holland * * * The construction contract * * * the specifications * * * and the arrangement diagram * * * are of a type of watercraft. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

The midbody was constructed, as are all United States merchant vessels, to meet the requirements of the American Bureau of Shipping * * * the United States Coast Guard * * * and the United States Public Health Service * * * The normal type of marine insurance policies were obtained to cover the vessel while in tow to the United States * * * The midbody was under construction for six months * * * and the transatlantic tow required 44 days * * *.

* * * The vessel was ballasted to achieve a better trim and thus to facilitate its voyage, and had draft marks painted on bow and stern like other vessels. * * *.

The midbody had been fitted with a temporary bow, and its stern section had been reinforced with additional steel prior to its voyage * * * The midbody as shown in Exhibit 1 was similar to two barges designed and constructed to carry 14,000 tons of cement; and it could have been used for the same purpose * * *.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

After its arrival in the United States the midbody in Exhibit 1 was delivered to a drydock. A T-3 tanker, originally 501 feet in length, had been cut apart, and the old midbody section had been removed. The stern and bow section of the old craft were joined to the new 525 foot midbody to make a self-propelled ore carrier * * *.

---

[1] Bethlehem Steel's midbody was similar. [Footnote by the Customs Court.]

The testimony also established that the midbodies were "pretty much completed" and ready for final installation. All bulkheading, tank tops, pipes, electrical work, and ladders and walkways were incorporated in the midbody. Equipment added after the installation included mooring winches, bitts and chocks; and cargo handling gear. The midbodies were not used to transport any cargo but appellant concedes they were capable of handling at least some form of cargo. Appellant did not introduce any evidence nor does it challenge any of appellees' evidence.

We are concerned with the dutiable status of two such midbodies. One was made for appellee Maryland Shipbuilding & Drydock Company in Holland, referred to above, and the other for appellee Bethlehem Steel Company in Germany. Maryland Shipbuilding had

---

[2] Counsel's opening statement on behalf of appellees in the trial court is also helpful: * * * the article in controversy is known as a midbody. It is the mid-section of a freighter. After the second World War, there were in the United States, a surplus of T-2 and T-3 tankers, a rather standard type vessel, and it was discovered that they could be more efficiently used if their mid-sections were enlarged. There developed a practice or technique of building a larger section by separating the bow and stern sections of the T-2 tanker from its center section and inserting the new mid-section. Some mid-sections were built in the United States; others were built abroad. This case involves two of such midbodies built in Europe, towed across the Atlantic, manned by a crew during the tow, brought into the United States from Holland, all in each instance all on its own bottom. * * *

contracted to sell the resulting self-propelled ore carrier to Pioneer Steamship Company. The cases were consolidated for trial.

The collector classified the midbodies under par. 397 [3] which states:

Articles or wares not specially provided for, whether partly or wholly manufactured:

＊ ＊ ＊ ＊ ＊ ＊ ＊

Composed wholly or in chief value of iron, steel ＊ ＊ ＊

＊ ＊ ＊ ＊ ＊ ＊ ＊

Other _____ 19% ad val.

Both appellees advanced alternate claims in their protests as filed. Each claimed that the midbodies were duty free; [4] or alternatively, that they were a structural shape dutiable under par. 312. This latter claim was deemed abandoned after trial and need not be considered here.

The Customs Court in sustaining the protests found that the midbodies were vessels and not subject to customs duties. The court in its opinion determined that "vessels are not goods, wares, or merchandise, which latter are subject to customs duties," relying on *The Conqueror*, 166 U.S. 110 (1897), and "'vessels' are beyond the reach of customs duties (*The Conqueror*) unless Congress elects to make them so as in paragraph 370 of the Tariff Act of 1930." After reviewing numerous cases interpreting the term "vessel," the court concluded that the midbodies qualified as vessels. The court stated in its opinion:

Of course, the tariff status of the craft must be determined by their *utility* or *capability for use* at the time of their arrival in the United States.

At that time, they had been towed on their own bottoms several thousand miles across the Atlantic Ocean.

---

[3] Tariff Act of 1930, as modified, 91 Treas. Dec. 150, T.D. 54108.

[4] The relevant portions of the protests as filed state as follows:

*Bethlehem*

We claim that said midbody sections are dutiable as structural shapes, assembled, under Paragraph 312, Tariff Act of 1930, at 7½% ad valorem. Alternatively said sections are not "articles" under 19 U.S.C. Sec. 1001 and therefore, are not described or provided for in the dutiable schedule. Further, said midbody sections were instruments of commerce at the time of entry and therefore were not "articles" under said Sec. 1001. Further, said midbody sections are "vessels" as that term is used in contradistinction to "articles" with respect to said Sec. 1001 and therefore are not subject to duty.

*Maryland Shipbuilding*

Such article is a structural shape dutiable under Par. 312 at 7½% ad valorem.

Alternatively it is not merchandise and therefore is not described by Title I Tariff Act of 1930.

Alternatively it is free of duty as part of a vessel.

Alternatively it is a vessel and not dutiable under any provision of the Tariff Act.

We further claim that the assessment of duties made herein is illegal and void. Each of the above claims is made with the proviso and conditionally that the rate or rates claimed are lower than the rate or rates assessed.

Appellees advanced the claim as vessels only.

They were seaworthy.

They had been constructed in accordance with designs, plans, and specifications carefully drawn by skilled naval engineers and architects to meet the rigid and accepted standards of navigational requirements.

They were launched in European shipyards as other watercraft would be launched.

They were floated and were fully equipped for proper and safe navigation under tow to the United States.

They were capable of transporting cargo if their owners elected to use them for that purpose.

They had the physical appearance of certain watercraft commonly seen in the harbors of our port cities used as barges being towed.

The mere fact that the midbodies were to become the mid-sections of ore carriers did not destroy their original character as watercraft *capable of being used* as a means of transportation in water.

The parties agree that there is no specific portion of the Tariff Act of 1930 applicable here exempting vessels from duties nor are mid-bodies included among the articles which are contained on the free list and, as such, expressly exempt from duty.[5] Rather, the duty-free status enjoyed by vessels stems from the Supreme Court's decision in *The Conqueror*, supra. In that case duty had been assessed upon a pleasure yacht. There was no dispute that the pleasure yacht was a vessel and the question before the court, as relevant here, was "whether this vessel was taxable under the tariff laws" 166 U.S. at 113. In its opinion the court set forth extensive comments concerning the relationship of vessels to the tariff laws.[6] While the parties here empha-

[5] The briefs indicate that the Tariff Act of 1930, as amended by the Tariff Classification Act of 1962, contains legislation concerning "vessels," "yachts or pleasure boats," and "buoys, beacons, landing stages, cofferdams, rafts, and other floating structures." The parties agree that the terms of this legislation are inapplicable to the midbodies here.

[6] These comments are as follows, 166 U.S. at 114–15: Was The Conqueror dutiable under the tariff act of October 1, 1890? 26 Stat. 567. This act requires duties to be levied upon all "articles" imported from foreign countries and mentioned in schedules therein contained, none of which schedules mention ships or vessels *eo nomine*. An abstract furnished us of the corresponding clauses in all the principal tariff acts from 1789 to the present date shows that duties are laid either upon "articles," as in the present act, or upon "goods, wares and merchandise"—words which have a similar meaning. Indeed, the words "articles" and "goods, wares and merchandise" seem to be used indiscriminately, and without any apparent purpose of distinguishing between them. While a vessel is an article of personal property, and may be termed "goods, wares and merchandise," as distinguished from real estate, it is not within either class, as the words are ordinarily used. * * * Vessels certainly have not been treated as dutiable articles, but rather as the vehicles of such articles, and though foreign built and foreign owned, are never charged with duties when entering our ports, though every article upon them, that is not a part of the vessel or of its equipment or provisions, is subject to duty, unless expressly exempted by law. * * *

Not only is there no mention of vessels, *eo nomine,* in the tariff acts, but there is no general description under which they could be included except as manufactures of iron or wood. But it is only by straining the word far beyond its ordinary import, that we are able to apply the word "manufacture" to a seagoing, schooner-rigged, screw steamship, 182½ feet long, nearly 25 feet wide, and of 372 tons burden. The term "manufacture" is as inapplicable to such a vessel as it would be to a block of brick or stone, erected in the heart of a great city. A ship is doubtless constructed of manufactured articles which, if imported separately, would be the subject of duty, but which put together in the form of a ship are taken out of the class of "manufactures," and become a vehicle for the importation of other articles. Considering the hundreds of foreign vessels which enter the ports of the United States every day, it is incredible that, if Congress had intended to include them in

size different portions of the above opinion, we are of the view that the following unambiguous statements from *The Conqueror* must be given effect and are controlling here:

But the decisive objection to the taxability of vessels as imports is found in the fact that, from the foundation of the Government, vessels have been treated as *sui generis*, and subject to an entirely different set of laws and regulations from those applied to imported articles. By the very first act passed by Congress in 1789, subsequent to an act for administering oaths to its own members, a duty was laid upon "goods, wares and merchandise," imported into the United States, in which no mention whatever is made of ships or vessels; but by the next act, entitled "An act imposing duties on tonnage," a duty was imposed "on all ships or vessels entered in the United States" * * * This distinction between "goods, wares and merchandise," and "ships or vessels," has been maintained ever since, although the amount of such duties has been repeatedly and sometimes radically changed. * * * Id. at 118.

\* \* \* \* \* \* \*

* * * It is scarcely possible that, if Congress had chosen to impose duties upon such yachts, or had supposed them subject to duty as imported articles, it would have also discriminated against them by requiring them to pay tonnage fees. In this, the latest expression of the legislative will, Congress seems to have recognized the theory, which we have already gathered from the prior course of legislation, that vessels should be treated as a class by themselves, and not within the general scope of the tariff acts. Id. at 120.

* * * We think that the liability of ships and vessels to tonnage dues and to light money, except where a certain class of vessels is specially exempted, shows that it was not the intention of Congress to treat them as dutiable articles. * * * Id. at 121.

The parties agree that the Supreme Court in *The Conqueror* did not define the term "vessel" or set forth the characteristics of types of watercraft which may qualify as a vessel.[7] The court below relied on certain statutory definitions of the term "vessel" and its construction by the courts. The statutory definitions are as follows:

1 USC
TITLE 1 GENERAL PROVISIONS
 CHAPTER 1—RULES OF CONSTRUCTION
 * * *
 § 3. "Vessel" as including all means of water transportation

---

the tariff acts, it would not have made mention of them in terms more definite than that of "manufactures."

\* \* \* \* \* \* \*

We do not undertake to say that the same rule applies to canoes, small boats, launches and other undocumented vessels, which are not used, or are not capable of being used, as a means of transportation on water, as the word "vessel" is defined in Rev. Stat. § 3. While these vessels have a limited capacity for transportation, they are ordinarily used for purposes of pleasure, and are not considered of sufficient importance to require them to be entered at the custom house, or to be entitled to the special protection of the flag. They are treated like other similar vehicles used upon land, and there are reasons for saying that these boats, which do not ordinarily come of themselves into the country, but are imported or brought upon the decks of other vessels, are mere manufactures or other "articles," and are within the description of the tariff acts.

[7] We have noted the court's comments on Rev. Stat. § 3, supra, footnote 5.

The word "vessel" includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

19 USC

(Tariff Act of 1930)

TITLE 19 CUSTOMS DUTIES

 CHAPTER 4—TARIFF ACT OF 1930

 SUBTITLE III—ADMINISTRATIVE PROVISIONS

 PART I—DEFINITIONS

 § 1401. *Miscellaneous*

When used in this subtitle or in Part I of Subtitle II of this chapter—

*Vessel*

(a) The word "vessel" includes every description of water craft or other contrivance used, or capable of being used, as a means of transportation in water, but does not include aircraft.

Representative cases discussed by the lower court concerning 1 USC 3 and the application of the term "vessel" may be briefly noted. In *Hitner Sons Co.* v. *United States*, 13 Cust. Ct. App. 216, T.D. 41175 (1922), the predecessor to this court after quoting the definition of vessel from what is now 1 USC 3, supra, stated, 13 Cust. Ct. App. at 219:

The courts of our country have had frequent occasion to discuss and decide what were and were not to be considered "vessels" under this definition. While these decisions are not uniform and are sometimes conflicting, a fairly definite construction can be gathered from them all. * * *

The court in *Hitner* held that a disabled Canadian warship towed into Philadelphia for sale as scrap metal was not a "vessel." The court stated, 13 Cust. Ct. at 221:

From these authorities some general conclusions may be deduced. In order to come within the definition of a "vessel" as fixed by section 3, Revised Statutes, the service upon which the thing in question can engage must be a maritime service. It must have some relation to commerce or navigation, or at least some connection with a vessel employed in trade. It must be engaged in, or in some sense related to commerce and navigation. The fact that the structure has the shape of a vessel, or has been once used as one, or could by proper appliances be again used as such, can not affect the question. The test is the actual status of the structure as being fairly engaged in or suitable for, commerce or navigation and as a means of transportation on water.

Applying these principles to the facts in the case at bar, it is obvious that the *Niobe* when brought within the customs jurisdiction of the country, was not a "vessel" within the meaning of section 3, Revised Statutes. * * *

In *The International*, 89 F. 484 (3d Cir. 1898), the owner of two scows and a dredge maintained they were vessels under what is now 1 USC 3 and not subject to duty as articles n.s.p.f. The court, in its opinion, reasoned that both the dredge and the scows qualified as vessels, stating, 89 F. at 485:

* * * While the dredge was not intended or adapted for the carriage of merchandise or passengers, and did not possess the power of self-propulsion

except to an inadequate extent through the use of its steam shovel or dipper as a paddle, it was nevertheless a water craft "used, or capable of being used, as a means of transportation on water." Its permanent home was on navigable water, and it was intended and adapted for navigation and transportation by water of its crew, supplies and machinery, from point to point, in carrying on the work of deepening and removing obstructions from channels and harbors in aid of navigation and commerce. * * * The scows also were water craft "used, or capable of being used, as a means of transportation on water." It is immaterial that they were to be laden with mud from the shovel or scoop of the dredge instead of ordinary merchandise. They were designed to receive and transport mud by water in the course of rendering valuable maritime service. Equally with the dredge they were vessels within the meaning of the statute. * * *

In *Thornley & Pitt* v. *United States*, 18 CCPA 265, T.D. 44428 (1930), it was held that two sailing yachts were vessels within the meaning of what is now 1 USC 3 and exempt from duties. The sailing yachts had entered the United States as cargo on the decks of a steamer.

Appellees also direct our attention to a second decision of the Supreme Court, *Norton* v. *Warner Co.*, 321 U.S. 565 (1944). The *Norton* case involved a barge which was moved by towing. The court held that the barge was a vessel under 1 USC 3 as it was "a means of transportation on water." 321 U.S. at 571. Appellees argue, "If that barge was a vessel, then clearly these midbodies * * * must have been vessels at the time of arrival." Its brief states:

The fundamental fallacy of Appellant's argument on the law in *The Conqueror* case, therefore, is that it does not and cannot distinguish these midbodies from *vessels*, as the term is defined in the statute. This weakness is accentuated when the brief * * * refers to these midbodies as "articles". This assumes the very point in issue and ignores the undisputed evidence which establishes that the midbodies have all the characteristics of non-self-propelled vessels and are therefore not "articles" at all. *The Conqueror, supra; The International*, 89 Fed. 484 (3rd Cir. 1898)

It is clear from appellant's brief that it does not, as appellees allege, assume the very point in issue. Appellant's theory is as follows:

* * * The Conqueror was not held to be non-dutiable because she met the statutory definition of "vessel" which is now contained in 1 U.S.C. 3 and in substance in 19 U.S.C. 1401(a). She was found non-dutiable because the undisputed facts showed that, in bringing her to American waters, her owner was not importing her "in the ordinary sense in which that term is used with reference to other articles" and was not commingling her "with the general mass of property." While the yacht presumably was not engaged in the carriage of cargo, the Court obviously considered that, in these circumstances, she should be given the same status as "vehicles of [dutiable] articles" which, it noted, have never been regarded as dutiable articles in themselves.

* * * Whether *capable* of being used to transport persons or cargo, the undeniable fact is that, unlike THE CONQUEROR or cargo ships which come to our

shores in the sole capacity of transporters of dutiable articles, each midsection was brought to the United States by a ship-building concern for a clear domestic commercial purpose: *viz.*, use in the rebuilding of a ship which (at least in the case of the Maryland Shipbuilding and Drydock Company) would then be sold to a shipping company for anticipated profit * * * Beyond doubt, the reason for using these foreign built midsections rather than American-made products was the same cost factor which influences most importations.

But whatever the motivation for importing foreign midsections rather than using a domestic equivalent, we do not see how appellees can seriously contend that, as the term was employed in *The Conqueror*, the midsections were not "imported". In the "ordinary sense" of the term to which the Supreme Court referred, the midsections were no less "imported"—i.e., became no less "a subject of sale and commerce" within the United States—than any other materials that might have been brought from abroad for use in the domestic rebuilding of tankers by appellees. In this regard, we think that even appellees would concede the dutiable status of, for example, hardware manufactured in Germany for installation in the rebuilt tankers. The short of the matter is that, analytically, *The Conqueror* precludes any distinction between two types of articles to be employed in ship construction on the ground that one of them may have, as a wholly incidential matter, physical characteristics rendering it capable of floating and carrying objects.

* * * Neither the court below nor appellees have suggested any other reasons which would call for the conclusion that, even though not on the free list, Congress necessarily intended that these items of commerce—brought into the United States for use in ship construction in the stead of the products of American industry—were to be non-dutiable. And, we submit, no reasons can be found.

Appellant's theory thus refuses to concede that if we find the "midbodies" are "vessels" then they are automatically exempt from tariff duties. Appellant maintains that the midsections are goods, wares and merchandise which were brought here for the purposes of sale and use in commerce in place of American-made goods. Appellant relies on the decision in *H. W. Chadbourne* v. *United States*, 27 CCPA 85, T.D. 49625. The issue in *Chadbourne* was whether a yacht was dutiable under par. 370 of the Tariff Act of 1930. Appellant there claimed the yacht had not been "imported" as the yacht had not been brought to New York by its former owner expressly to sell it to *appellant.* In rejecting such an argument, the court stated, 27 CCPA at 87–88:

* * * we may take judicial notice that shipbuilding is an industry of importance in the United States. Many American workers labor in the production of large ocean-going yachts such as the *Heluis*, from miners, lumbermen and the like, producing raw materials, to designers and skilled artisans who combine the materials into the finished article. If the contention of appellant is correct, it would seem that the purpose of the tariff act "to encourage the industries of the United States" and to "protect American labor" would be thwarted.

Appellant relies on the above quotation as establishing that a complete vessel may, notwithstanding 1 USC 3, be held a dutiable article.

Appellees counter the above argument as follows:

The distinction between "vessels" and "articles" has continued except that, by the Tariff Act of 1922, Congress made certain yachts and pleasure-boats subject to customs duty. Since 1922 the uniform administrative practice has been in harmony with the *Chadbourne* case and as well, with the rule of *expressio unius est exclusio alterius.* * * * with the exception of yachts and pleasure-boats, which are specifically taxed, all other vessels are exempt from customs duties by virtue of the Supreme Court decision.

\* \* \* \* \* \* \*

* * * appellant discusses the *Chadbourne* case, holding that a *yacht* was dutiable under the Tariff Act of 1930. This proves the exception, not the rule. Of course it was dutiable because Paragraph 370 of that act brought a yacht within the definition of "motorboat." Neither *Chadbourne* nor any other case holds that vessels generally are subject to duty, and this is so regardless of their purpose in entering our waters. Those cases that discuss the subject, including *Chadbourne* and *Roberts*, affirm the *Conqueror* rule and hold that vessels, other than yachts and pleasure-boats, are not "articles" within the Tariff Act.

\* \* \* \* \* \* \*

Appellant did not prove that "vessels" which are brought here to be sold are subject to duty. It proved only that yachts and pleasure-boats are dutiable (and as to them, the purpose of importation is irrelevant). The *Chadbourne* case specifically recognized that, in all other respects, the rule in the *Conqueror* case is still in effect.

Appellees thus concede some vessels under 1 USC 3 are dutiable but only to the extent expressly provided for by statute and all other vessels are duty free.

This disagreement between the parties as to whether structures which may qualify as vessels under 1 USC 3 may also be held dutiable if brought to this country for purposes of sale need not be resolved. ▮ If the midsections are not vessels, in view of the applicable substantive principles of law, then accordingly they are not entitled to duty-free status under any theory or authority advanced by appellees. We hold that they are not vessels.

We agree that it is the condition of the structure at the time of importation that controls its classification and not what it is made into after importation. *Leonard Levin Co.* v. *United States*, 27 CCPA 101, 105 C.A.D. 69. And doubt as to the construction of a paragraph of the Tariff Act should be resolved in favor of the importer, as discussed by the court below, citing *Hartranft* v. *Wiegmann*, 121 U.S. 609 (1887); *American Net & Twine Co.* v. *Worthington*, 141 U.S. 468 (1891); see also *Von Bremen, Asche & Co.* v. *United States*, 12 Ct. Cust. App. 407, T.D. 40585, cited by appellees. We also recognize that, as stated by the lower court,

* * * while there is a diversity of opinion of the meaning of the term "vessel," the overwhelming weight of judicial authority has favored a liberal interpre-

tation and application of the term to a wide variety of watercraft used for many diverse purposes.

However, we disagree with the legal conclusion advanced by the lower court in its opinion that:

It seems highly incongruous and unbelievable that Congress could have intended that scows, dredges, barges, elevators, log rafts, houseboats, and old hull converted into a wharf boat, and so many inferior craft should be classified as vessels (as held by the courts) and at the same time have intended that a staunch seagoing craft, possessing the requisite navigational qualifications possessed by these midbodies, should be relegated to the unenumerated catchall provision of paragraph 397 as articles of metal.

While the above statement accurately summarizes the case law, first, the only evidence of Congressional intent of record in regard to vessels and the Tariff Act of 1930 is that cited in *Chadbourne*, supra, which is applicable in all tariff cases and applied to the yacht there: the purpose of the Tariff Act is to encourage industries of the United States and protect American labor. There is no evidence Congress intended, as appellant states, that "any floating object which has the capacity to carry merchandise must be accorded duty-free status." Second, that the midbodies are "staunch seagoing" structures does not establish that they are vessels. Rather, in all the cases cited, each of the "inferior craft" was capable of and designed to perform a sufficiently related function to "means of transportation" on water to qualify as a vessel. The liberality expressed in the law in interpreting the term "vessel" goes to the very fact that size and structure per se does not determine that a structure is a vesssel.

The midbodies, at the time of importation, were not "barges" or equivalent to a barge as appellees would have us hold. They were precisely what the evidence shows, a midsection for a vessel. They were complete in nearly every respect, as pointed out supra. In order to tow them across the ocean they were fitted with temporary, sturdy fore and aft sections.

All of the evidence of record establishes that the midsections, at the time of importation, were not watercraft designed or intended as a means of transportation on water. Their sole resemblance to craft that have been held to be vessels (barges) and their qualification under a literal reading of the definitions advanced as vessels stems from the fact that temporary fore and aft sections were constructed for the tow across the ocean *to make possible their designed and intended use as midsections and not means of transportation.* We find our conclusion that the midbodies are not vessels is consistent with all of the cases discussed below and relied upon by appellees.[8]

---

[8] Appellees cite *United States* v. *Tug Parris Island,* 215 F. Supp. 145 (E.D.N.C. 1963) for the proposition that a midbody is a vessel, a position allegedly argued for by the Government and sustained by the court therein. Appellant denies that the Government has adopted the position that a midsection is a vessel; it argues "an action *in rem* may

Appellees' position is not without merit. We also are aware that the classification determined by the Customs Collector, articles n.s.p.f. assessing duties at 19% ad val., may seem at first blush to be unusual in view of the fact that the midbodies traveled across the Atlantic Ocean, yet, for customs purposes, are not to be regarded as "vessels."

However, the fact is that the midbodies made that trip for the exclusive purpose, and were designed and intended for no other reason than to serve as midsections of ore carriers. Thus considered, the midbodies were not vessels at the time of importation, consistent with the Supreme Court mandates we have to guide us in *The Conqueror* and *Norton* cases, supra.

As we find that the midsections are not vessels, they are not entitled to duty-free status.[9] No other claim having been advanced in support of the protest against the classification found by the customs collector, we find the classification of the customs collector to be correct and the decision of the Customs Court is therefore *reversed*.

---

lie against *any* object in the navigable waters so long as it is not in some manner affixed to the land," citing cases. As we read the *Tug Parris Island* case, the court therein held that the owner of the midsection could not be held responsible for the actions of the tug operators who were towing the midsection at the time of the accident. The decision rests on the fact that others were in charge of navigation and not the particular status of the midsection.

[9] Appellant devoted a portion of its brief to an argument which states, in substance, that appellees in this litigation advance a position inconsistent with previous proceedings before the Bureau of Customs. Specifically, appellant argues that appellees sought a determination from the Customs Bureau that constructing or rebuilding an ore carrier in the manner stated in the text, supra, would not amount to a forfeiture of domestic trade rights (see section 27 of the Merchant Marine Act of 1920, as amended, (46 USC 883)). Appellees, having allegedly succeeded in obtaining a ruling from the Customs Bureau that such an ore carrier would not be "rebuilt outside the United States," appellant argues, is now trying "to have their cake and eat it too." Appellant's theory is that appellees have argued previously that the midbodies are not "vessels" and here argue that they are vessels. Appellees argue against the appellant's position, alleging that they did *not* advance such a position and further, the whole argument is beyond the powers of review of this court. We find it necessary to note the disagreement between the parties only and to state that it has no bearing upon our decision.