**BUCK KREIHS COMPANY, Inc.**
v.
**The UNITED STATES.**
No. 240–69.

United States Court of Claims.
June 12, 1970.

Peter J. Butler, New Orleans, La., attorney of record for plaintiff; Sehrt, Boyle, Wheeler & Butler, New Orleans, La., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant; Peter J. P. Brickfield, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COL–

LINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

Plaintiff, a Louisiana corporation, brings this action to recover certain monies paid to defendant consequent to the application of an allegedly unlawful profit limitations provision in its Government contract. This court's jurisdiction is said to spring from our Tucker Act authority to render judgments upon any claims against the United States founded upon express or implied contract. 28 U.S.C. § 1491 (1964). As the ensuing opinion will establish, however, the instant Contract is maritime in nature, and therefore cognizable under the *exclusive* admiralty jurisdiction of the Federal District Courts. 46 U.S.C. § 742 (1964).

On July 30, 1965, plaintiff, Buck Kreihs Company, entered into Master Lump Sum Repair Contract MA–738 with defendant acting through the Director, National Shipping Authority of the Department of Commerce, Maritime Administration (MARAD). By this Contract, plaintiff agreed to repair, alter, convert, and otherwise restore certain vessels of the "Victory" ship classification then laying in "mothballs" in the New Orleans area. Pursuant to MA–738, MARAD issued plaintiff eight job orders for the repair and general restoration of the following vessels:

| | | |
|---|---|---|
| S/S Hobart Victory | Job Order | # 4 |
| S/S Oberlin Victory | " " | # 3 |
| S/S Cornell Victory | " " | # 2 |
| S/S San Mateo Victory | " " | # 8 |
| S/S Southwestern Victory | " " | # 9 |
| S/S Hattiesburg Victory | " " | # 7 |
| S/S Rutgers Victory | " " | # 6 |
| S/S Loma Victory | " " | # 5 |

Prior to their delivery to plaintiff's shipyard, these vessels formed part of this nation's reserve fleet of merchant ships. It is undisputed that MARAD's purpose for restoring these vessels was to ready them for active sea duty as supply carriers to serve American soldiers in Vietnam.

Plaintiff alleges that all work prescribed by the job orders was completed in calendar year 1966, resulting in a bill to defendant of $1,871,826.50. After paying this amount in full MARAD audited plaintiff's books and determined that it had received $54,437.96 in excess of allowable profits. Plaintiff was immediately invoiced for this amount and following subsequent negotiations, it was mutually agreed that plaintiff should remit $45,717.01. The remaining $8,720.-95 was left as the basis of a dispute unrelated to this case.

MARAD also sought to audit one of plaintiff's subcontractors but was refused. Consequently, plaintiff was invoiced an additional $17,382.60 as a penalty for its subcontractor's refusal.

Plaintiff's objective in this suit is to recover the sum of the excess profits and penalty assessments.

The substantive issue presented would require us to determine the validity of the Article 41 provision found in Addendum 3 to the Contract which purports to impose certain limits on the profits that plaintiff and its subcontractors may derive from the Contract.

Briefly, plaintiff makes the following arguments on the merits: The Renegotiation Act of 1951, 50 U.S.C. App. §

1212(e) (1964) governs profits derived from the instant Contract to the exclusion of the profit limitation provisions found in § 505(b) of the Merchant Marine Act of 1936, 46 U.S.C. § 1155(b) (1964). Defendant attempted to circumvent this statutory exclusion by paraphrasing § 505(b) and incorporating it into the Contract as Article 41. Since § 1212(e) of the Renegotiation Act expressly provides that: "notwithstanding *any* agreement to the contrary," § 505(b) of the Merchant Marine Act is inapplicable where a contract is covered by the Renegotiation Act, Addendum 3 (Article 41) is a nullity and the monies collected under its terms should be refunded. Excess profits liability for plaintiff and its subcontractors can only be determined under the provisions of the Renegotiation Act.

Defendant counters with these rebuttals: Article 41 was not added to the Contract pursuant to § 505(b), *supra,* as evidenced by the nature of the Contract. Plaintiff, under MA–738, was required to *repair* vessels; § 505(b) is limited to control only those profits derived from new vessel *construction* contracts or from contracts to repair vessels engaged in *charter* operations. Article 41 is a valid contract provision. In drafting amendments to the Renegotiation Act, the Senate considered preempting Article 41 provisions along with the profit limitations of § 505(b), but when enacted, the resulting § 1212(e), *supra,* was silent as to Article 41s, thus impliedly validating their use.

We are unable to reach this issue without overstepping our established jurisdictional boundaries. Our discussion below explains why plaintiff must seek relief elsewhere.

The following fundamental premises provide a good introduction to our jurisdictional problem: Under the Suits in Admiralty Act, 46 U.S.C. § 742 (1964), any cause of action which, if brought against a privately owned vessel or cargo, would compel a proceeding in admiralty, can now be maintained against the United States *in personam* in an appropriate non-jury proceeding. Such suits *"shall* be brought in the district court of the United States for the district in which the parties so suing, or any of them, reside or have their principal place of business in the United States, or in which the vessel or cargo charged with liability is found." (*Id.*) (Emphasis supplied). Even where such suits are founded upon express or implied contracts made with the United States, they are not cognizable under the Court of Claims' Tucker Act jurisdiction. New Orleans Stevedoring Co. v. United States, 185 Ct.Cl. 604 (1968), cert. denied, 397 U.S. 1064, 90 S.Ct. 1501, 25 L.Ed.2d 685 (1970); Smith-Johnson Steamship Corp. v. United States, 142 F.Supp. 367, 135 Ct.Cl. 866, cert. denied, 352 U.S. 895, 77 S.Ct. 127, 1 L.Ed.2d 85 (1956). Finally, claims founded upon maritime contracts give rise to admiralty jurisdiction. *See e. g.,* De Lovio v. Boit, 7 F.Cas. 418, 444 (No. 3776) (C.C.D.Mass.1815).

Defendant contends that a contract to repair a vessel is maritime. Alcoa Steamship Co. v. Charles Ferran & Co., 383 F.2d 46 (5th Cir. 1967); see also Flowers v. Travelers Ins. Co., 258 F.2d 220 (5th Cir. 1958). Since the instant Contract was written by MARAD and interpreted by plaintiff to be for vessel repairs, defendant concludes that the Contract is maritime and beyond our jurisdiction.

In its brief, plaintiff asserted that its suit "is not a libel filed against the United States * * * [nor is it one for] damages arising out of tort or breach of contract." Rather it insisted that the "thrust of [its] Petition is to have this Court adjudicate whether * * * an administrative agency of the United States applied the proper act in attempting to recapture purported excess profits." In essence plaintiff is now telling us that the merits of its claim derive not from the contract but rather from § 1212 (e) of the Renegotiation Act. We believe, however, that plaintiff's original classification of its claim, as given in its petition is more accurate legally: "The United States Court of Claims has juris-

diction with reference to this suit * * *as it is founded upon a contract with the United States of America.*" (Emphasis supplied.) Our conclusion is dictated by our decision in Smith-Johnson Steamship Corp. v. United States, *supra*.

In *Smith-Johnson*, plaintiff contracted with the Maritime Commission for the charter of certain vessels. Included in the charter agreement signed by the parties was a profit limitation schedule which the Government later employed in determining that plaintiff had earned in excess of allowable profits. Plaintiff paid the assessed amount and thereafter brought suit in this court alleging that the Government had exacted from it more than was authorized by § 5(b) of the Merchant Ship Sales Act of 1946 and § 5(c) of the Merchant Marine Act of 1936. The narrow issue before us was whether this was a claim founded upon the charter agreement contract, in which case it was a maritime issue within the exclusive jurisdiction of an appropriate district court, or was it founded upon the two Federal statutes, in which case we had jurisdiction under the Tucker Act. Although we initially decided the latter was true, Smith-Johnson Steamship Corp. v. United States, 139 F.Supp. 298, 135 Ct.Cl. 869, cert. denied, 351 U.S. 988, 76 S.Ct. 1047, 100 L.Ed. 1501 (1956), the Supreme Court's per curiam affirmance of the Second Circuit's Sword Line, Inc. v. United States, 351 U.S. 976, 76 S.Ct. 1047, 100 L.Ed. 1493 (1956), impelled us to reverse our position. Smith-Johnson Steamship Corp., *supra*, 142 F.Supp. 367, 135 Ct.Cl. at p. 866. The Supreme Court said simply: " * * * The libel, though dependent on a statute, alleges unjust enrichment from a maritime contract."

Since our plaintiff's claim is similarly motivated in that it seeks to recover excess profits exacted under an allegedly unlawful contract provision, we are bound by our second *Smith-Johnson* to hold that it is a claim founded upon a contract. Hence, since plaintiff conceded in its brief that this was a vessel repair contract, it would appear that its *entire* claim is founded upon a maritime contract not cognizable in this court.

Plaintiff urges, however, that at least with respect to three of the ships—the Hobart, Oberlin and Cornell—MA–738 was not a maritime contract. While admitting that its assigned task under the contract was to prepare these ships for navigation and commerce, plaintiff argues that at the commencement of repairs the Hobart, Oberlin and Cornell were "incapable of self-propulsion and * * * totally unfit for navigation of any kind." Hence it concludes that they were "dead" ships, and accordingly advises us that the "jurisprudence is quite clear that any contract concerning itself with a 'dead' vessel is non-maritime in nature."

Before further elaboration of this issue, we feel obliged to introduce it with a brief clarification: In probing the "dead" ship exception to maritime law, we encounter the strikingly similar but distinct "loss of vessel identity" exception. The former turns upon whether a vessel has been withdrawn from navigation and commerce; Hercules Co. v. The Brigadier General Absolom Baird, 214 F.2d 66 (3d Cir. 1954); Murray v. Schwartz, 175 F.2d 72 (2d Cir. 1949), rev'g on other grounds Murray v. The Meteor, 78 F.Supp. 637 (E.D.N.Y.1948); The Poznan, 9 F.2d 838 (2d Cir. 1925); Rijnders v. Yacht Green Lion, 1955 Amer.Mar.Cases 83 (S.D.N.Y.1954); Hanna v. The Meteor, 92 F.Supp. 530 (E.D.N.Y.), aff'd per curiam, 184 F.2d 439 (2d Cir. 1950); The C. Vanderbilt, 86 F. 785 (E.D.N.Y.1898), while the latter inquires whether the vessel experienced such complete destruction at sea or such comprehensive conversion in a ship yard as to characterize her rebuilding as the construction of a new vessel rather than the repair of an old one. New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922); Advance Welding Co. v. M/V Corra D, 299 F.Supp. 736 (E.D.La. 1969); The George W. Elder, 196 F. 137 (D.Oregon 1912). Though the line separating these exceptions has been blurred

on occasion, *e. g.*, The Frances L. Skinner, 348 F. 818 (D.C.1917), we think it clear that their dissimilar criteria command that they be considered independently. Therefore, in resolving the instant "dead" ship question, "loss of vessel identity" cases will not be deemed authoritative.

Plaintiff's assertion that the Hobart, Oberlin and Cornell were dead vessels is founded wholly on their physical status at the commencement of repairs— "incapable of self-propulsion and totally unfit for navigation or commerce of any kind." In support of this "physical status" criterion, plaintiff cites Hanna v. The Meteor, *supra;* Murray v. Schwartz, *supra;* and Rijnders v. Yacht Green Lion, *supra.*

*Hanna* and *Murray* involved the same ship—S/S Meteor. *Hanna* was an *in rem* action to enforce a maritime lien against the Meteor for labor and services furnished in painting part of the vessel. Chief Judge Inch framed the issue as follows: "[T]he only question presented is whether the Meteor was a 'dead' ship at the time of the rendition of services, for upon that determination depends whether the subject-matter of this suit is within the admiralty jurisdiction of this Court." *Hanna,* 92 F.Supp. at p. 530. After a "trial on the merits", Chief Judge Inch, without rationale, concluded that when painted, the Meteor was a dead ship. The findings show she was "withdrawn from commerce" and had been part of the James River Reserve fleet; was towed to New York where the painting was performed, had no crew, her machinery was not in operation, and she was sold for scrap the next year.

Before analyzing *Hanna,* we think it appropriate to summarize the other case involving the Meteor. *Murray* was an *in rem* action to enforce a maritime lien for wharfage services. As mentioned in the *Hanna* court fact findings, the Meteor was towed, on June 11, 1947, to Shooters Island—her last resting place before the scrap heap. After reciting the particulars of her crippled condition which had neither worsened nor improved since her painting, the same district court made this observation (78 F.Supp. p. 638):

\* \* \* \* \* \*

She [the Meteor] was not placed at the libellant's wharf in order to enable her to continue in navigation, because she could not continue that which she had not begun at any time since her removal from Norfolk whence she was towed to New York. In order to become an instrument of navigation, extensive repairs will first have to be made, and proper documentation effected.

\* \* \* \* \* \*

Upon finding that "[a]t all times material hereto, the Meteor was not an instrument of commerce, and had been withdrawn therefrom \* \* \*.", the court, citing *The Poznan, supra,* concluded that as a matter of law "[n]o maritime lien arose for wharfage furnished to the Meteor by this libellant." Hence she was a dead ship. Without adding any new legal wrinkles, the Second Circuit affirmed this appraisal. 175 F.2d 72 (2d Cir. 1949).

It is notable that these cases were decided, or seemingly so, without the benefit of knowing what use of the Meteor, if any, was intended, immediately following her painting and wharfage. *The Poznan,* cited as sole case authority in *Murray* and doubtless the silent authority in *Hanna* (issued without case citation) indicates to us that this is a relevant consideration.

Bound for Havana, Cuba, with cargo, the Poznan aborted her voyage and returned to New York. On her arrival she was arrested by the United States Marshal for the Southern District of New York, and thereafter numerous libels were filed against her for damages to cargo and failure to deliver it. The instant libellant, however, was suing to recover wharfage charges for services rendered the Poznan subsequent to her arrest. The court held clearly that such services were not performed pursuant to a maritime contract since at the time

of performance the ship was in *"custodia legis"* and hence withdrawn from navigation and commerce. As in *Murray* and *Hanna,* the future commercial use of the Poznan was speculative. The only immediate certainty facing the vessel was a sale for the benefit of her many libellants. But unlike those cases, the conclusion that the Poznan was a dead ship stemmed from her legal, not her physical status. Judging from the court's reasoning, it would appear that a vessel dead by such operation of law could *only* be revived by further legal process whereas such would not be the case with physically dead vessels. That immediate plans for commercial operation should have a reviving effect on such vessels is reasonably inferable from the *Poznan* court's quotation with approval from the *C. Vanderbilt, supra,* which indicates that a vessel is dead if tied up for the winter because of ice but comes to life when they start to fit her out for a spring voyage.

Rijnders v. Yacht Green Lion, *supra,* is urged upon us by plaintiff. The Green Lion was a foreign vessel documented under the laws of Holland. After a dutiable entry into New York in 1950, her owner, the present libellant, agreed that claimant should haul her to its ship yard, reconstruct her suitable for resale in the United States, and store her pending registry. Although the district court found the Green Lion to be a dead ship, the premises for this finding are unclear. The following language was doubtlessly intended to enlighten (p. 84):

> \* \* \* \* \* \*
> \* \* \* This ship was a "dead ship" and could not be sold. No effort was made by the libellant, her owner, to qualify her for any use upon the water. \* \* \* As far as libellant was concerned \* \* \* the vessel was unsuable (sic)—dead. The whole purport of the oral agreement [between libellant and claimant], \* \* \* was to render services which made hauling a necessary condition. They were intended to be rendered by the claimant

upon land and while they were certainly intended to restore the vessel to a condition fit for her navigation, that alone does not qualify the contract as a maritime contract. \* \* \*

Query: Did the Green Lion's saleability contribute to her dead ship status? Was the need to haul her and make repairs on dry land further indicia of deadness? What did the court mean when it said that libellant took no steps "to qualify her for any use upon the water" but then at the same time it recognized that the claimant's services were "intended to restore the vessel to a condition fit for her navigation."? It is also notable that although the ultimate objective of claimant's work was to make the Green Lion navigable, the immediate aim of her owner was to merely make her saleable.

Defendant contends that the Hercules Co. v. The Brigadier General Absolom Baird, *supra,* is the better reasoned and therefore more dispositive authority. We agree. This was a libel *in rem* seeking to enforce a maritime lien for unpaid repairs furnished the Baird. Working from April 3 to July 17, 1950, libellant sought to ready the vessel for a sealing voyage off the coast of Labrador. The Baird, while under repair, had no Coast Guard Certificate of Inspection and there was no evidence as to whether she was registered or enrolled. The initial work was not enough to prepare her for the 1950 sealing season and consequently she had to be towed to anchorage elsewhere. On March 19th of the next year, the Baird was towed back to libellant's yard for further repairs. In one month she was seaworthy and known to embark on her sealing voyage.

Because of her weakened condition and decommissioned status, the district court ruled the Baird a dead ship. The Third Circuit reversed, however, saying that the above facts could not support a finding that the Baird was "withdrawn from marine commerce and navigation." That the repairs were ordered to prepare her

for a sea voyage settled the question for the appellate court (214 F.2d p. 69):

\* \* \* \* \* \*

\* \* \* the efforts of everyone concerned were bent upon readying her for a sealing voyage. That is a sufficient devotion to marine commerce to make her a vessel. (Citation omitted). \* \* \* Once given a completed vessel, we think that the purpose and business of the craft or use for which she is intended when the repairs are completed are the factors which determine whether there is admiralty jurisdiction. (Citation omitted). Here libellant's services were ordered and furnished to prepare the Baird to go sealing, an obvious maritime venture. \* \* \* If the Baird ever was withdrawn from navigation and maritime commerce, she was returned to those pursuits when her owners and would-be owners began putting her in shape for an intended voyage, which in fact took place in April of 1951 \* \* \*.

It will be noted that the efforts the court describes, with the purpose stated "made her a vessel." In that court's semantics a "dead" ship is evidently a non-vessel. This directs attention to a body of customs law which we believe ought to receive consideration as it is, we think in *pari materia*.

By the leading case of The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897), a vessel arriving from foreign points is not "goods, wares, or merchandise" subject to ordinary customs duties. The customs provisions fashioned for vessels, as *e. g.*, tonnage and light duties, are presumed to be the only applicable revenue exactions when the Congress does not expressly declare otherwise. This has rendered it necessary occasionally for the customs courts to determine whether certain floating structures, arriving from abroad, are or are not vessels. In the course of this branch of jurisprudence we have; Hitner Sons Co. v. United States, 13 Ct.Cust.App. 216 (1925), in which the obsolete, worn out and dismantled Canadian cruiser Niobe, towed to Philadelphia only to be scrapped,

was held not to be a "vessel" and consequently, to be subject to the ordinary customs duties as "goods, wares, or merchandise." She would have been a "dead" ship by the jurisprudence plaintiff here has invoked.

A more recent case, United States v. Bethlehem Steel Co., 53 C.C.P.A. 142 (1966), cert. denied, 386 U.S. 912, 87 S.Ct. 865, 17 L.Ed.2d 786, reh. denied, 386 U.S. 987, 87 S.Ct. 1284, 18 L.Ed.2d 241 (1967), appears as if devised for a moot court to test out the principles involved in the instant litigation, but it really happened. Plaintiffs below imported "midbodies" built in European shipyards and towed over here. They were to be inserted by a U.S. yard between the bows and the sterns of existing American built tankers, replacing previous smaller and less efficient midbodies. The new entity was expected to enjoy, and afterwards did, the identity of the previous American vessel, important with respect to participation in the American coastwise trade, which is barred to foreign built vessels. The Customs Service held that the midbodies, on arrival, were "goods, wares, or merchandise" but the importer contended they were vessels, exempt from ordinary duty under the *Conqueror* doctrine.

The Customs Court, the trial tribunal, held in effect as follows: non-self-propelled barges are vessels, these midbodies look like barges and are fully suitable for the same uses, customs classification for duty purposes depends on the condition as imported, therefore they are vessels. 54 Cust.Ct. 1, 238 F.Supp. 483 (1964).

The appellate court, the Court of Customs and Patent Appeals, reversed, holding in effect that it did not matter that the midbodies were physically well adapted to be barges. What controlled was dedication (p. 153):

\* \* \* \* \* \*

\* \* \* the midbodies made that trip [across the Atlantic] for the exclusive purpose, and were designed and intended for no other reason than to serve as midsections of ore carriers.

Thus considered, the midbodies were not vessels at the time of importation,

* * *.

Thus, one takes it, no degree of physical perfection as a vessel would make an imported floating structure a vessel if dedicated for other uses. Conversely, no degree of dilapidation ought to disqualify the structure as a vessel if she is dedicated still to that exclusive purpose. The Niobe, *supra,* was not a vessel only because hope of further use for that purpose was abandoned, and the opinion makes that clear. Likewise, a floating structure that was always dedicated as a vessel would remain or resume status as a vessel, not a "dead" ship, during a period of restoration and repair for new voyages, any degree of dilapidation notwithstanding. The Third Circuit in the *Baird* case, *supra,* is very clear about this and, we think, correctly. Rightly, too, it cites North Pac. S.S. Co. v. Hall Bros. Co., 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919), in support of its position.

So far as the other "dead" ship cases in lower Federal courts differ from *Baird,* it might be, particularly in the two S.S. Meteor cases, *supra,* that they are in accord on their facts. *The Poznan,* the ship under judicial seizure, involved that peculiar fact situation. The *Green Lion* case is *contra* to *Baird* and we think just simply wrong on the facts reported.

As the court says in *Baird,* if a laid-up ship is ever to be deemed withdrawn from trade or commerce the return to it takes place at the beginning and not at the end of a period of restoration and repair. There is nothing in this case to show that the involved ships were laid up for any reason other than to preserve them for future maritime needs. They were not being held for a rise in the scrap metal market.

New Bedford Dry Dock Co. v. Purdy, *supra,* deals with a vessel under a contract for reconstruction which the claimant urged was so extensive it was really new construction and therefore not maritime. The Supreme Court said (258 U.S. p. 99, 42 S.Ct. p. 244) it was not disposed to enlarge the rule excluding contracts for new construction as maritime, and in case of:

* * * * * *

* * * agreements of uncertain intendment—reasonable doubts concerning the latter should be resolved in favor of the admiralty jurisdiction. * * *

We think this statement is broad enough to cover the instant situation, and in case we entertained doubt, which we do not, it would suffice to resolve it.

Our analysis is more realistic in that it does not blind itself to the obvious maritime nature of the contract—a traditional indicator of admiralty jurisdiction, People's Ferry Co. of Boston v. Beers, 61 U.S. (20 How.) 393, 401, 15 L.Ed. 961 (1857), and because of its objective standard it is also more functional and fair. A weakness of the *Green Lion* technique is that it hardly can be contended that any immobilization for repair purposes or for lack of business or both makes the ship a dead one, even if it is only for a few days, yet how much dilapidation, how much immobility, is nowhere specified.

Since it is undisputed that the immediate purpose of the instant repair Contract was to ready the Hobart, Oberlin and Cornell for active service as supply carriers, we believe that if they were ever dead this was "a sufficient devotion to marine commerce" to revive them from deadness, physical, or technical deficiencies notwithstanding. We therefore hold specifically that as to these three ships as well, MA–738 was a maritime contract.

Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is allowed to the extent that the case is transferred to the United States District Court for the Eastern District of Louisiana pursuant to 28 U.S.C. § 1506 (1964).